661 So.2d 1078 (1995)
STATE of Louisiana
v.
Ernest ALLEN a/k/a Michael Hayes and George Cooks a/k/a Lawrence Kelly.
No. 94-KA-1895.
Court of Appeal of Louisiana, Fourth Circuit.
September 15, 1995.
*1080 Harry F. Connick, District Attorney, Val Solino, Assistant District Attorney, New Orleans, for Plaintiff/Appellee.
Sherry Watters, Orleans Indigent Defender Program, New Orleans, for Defendant/Appellant, George Cooks, a/k/a Lawrence Kelly.
Kevin V. Boshea, Regan, Manasseh & Boshea, New Orleans, for Defendant/Appellant, Ernest M. Allen, a/k/a Michael Hayes.
Before CIACCIO, ARMSTRONG and JONES, JJ.
ARMSTRONG, Judge.
The defendants, Ernest Allen a/k/a Michael Hayes and George Cooks a/k/a Lawrence Kelly, were indicted for the first degree murder of Arnold Donnie Morris, in violation of La.R.S. 14:30. The defendants pled not guilty at their arraignment. Motions to suppress filed by both defendants were denied by the trial court.[1] Following a two day jury trial, the defendants were found guilty as charged on March 22, 1994. The jury returned a recommendation of life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. On May 23, 1994, defendant Cooks filed a motion for new trial. The trial court denied the motion for new trial on August 5, 1994. On the same date, the trial court sentenced both defendants to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendants now appeal.

FACTS:
Arnold Morris was the victim of a drive-by shooting which occurred at approximately 5:00 p.m. on March 29, 1992 in the 900 block of Josephine Street in New Orleans. At trial, Joyce Morris, the victim's mother, testified that she had seen her son the morning of the incident, left and returned from shopping to learn that he had been shot. When she arrived at the hospital, she was informed that he had died.
Theodore Wesley was with the victim at the time of the shooting. Wesley testified that he had left his aunt's house at 5:00 p.m. on Sunday March 29, 1992, and was on his bicycle when he saw Arnold Morris go by him in a truck. Wesley grew up with Morris and they lived in the same neighborhood. *1081 Morris stopped for Wesley but remained in the cab of the truck. As Wesley was putting the bicycle in the back of Morris' truck, a slow moving truck approached them. Wesley saw the defendants hanging out of the passenger window of the truck. As the defendants approached Wesley and Morris, they began shooting at Wesley and the victim. Wesley testified that he knew the defendants from school. He could not see the person driving the truck. Morris attempted to escape the gunfire but his vehicle struck a light pole. The defendants stopped near the victim's truck and continued shooting at him. The next thing the witness remembers is speaking with the police at the hospital.
The witness recalled telling a police officer that the defendants shot him and Morris. The witness also made an identification of the defendants in a photographic lineup. Wesley testified that his cousin, Charles Gatson, was coming from the apartment complex's courtyard when the shooting occurred.
New Orleans Police Officer Glen Gross and his partner were dispatched to the scene of the shooting. When they arrived in the 900 block of Josephine Street, no victims or witnesses were present. The officers were advised by the police dispatcher that the victims had been taken to Charity Hospital. The officers then went to the hospital where Officer Gross spoke with Wesley who gave the officer the names of the men who shot him. Officer Gross also observed Morris' truck while at the hospital and noted gunfire damage to the vehicle.
Officer Paulette Pitts Owen was already at Charity Hospital on another matter when the shooting victims arrived. Officer Owen was assigned to cover the shooting incident. She observed shattered windows and bullet holes in the truck. Arnold Donnie Morris was in the back of the truck with multiple gunshot wounds. The other victim, Theodore Wesley, was taken to the hospital in another vehicle. Officer Owen wrote out the police report. However, she did not take any information from the victims. The information was obtained by another officer and relayed to her. She did not recall who gave her the description of the assailants' truck.
Detective Marco Demma of the New Orleans Police Department Homicide Division investigated the scene of the shooting. There were eight empty 9mm cartridge casings found on the street in addition to a bullet, a spent bullet, a jacket fragment and blood stains. No weapons were found on the scene. The homicide investigation was then transferred to Detective Jerry London.
Dr. Peter Deblieux, the physician on duty in Charity's emergency room on the night of the shooting, testified that Theodore Wesley sustained several gunshots wounds, including a graze wound to the left cheek, a wound to the left armpit, a chest wound, a wound which broke Wesley's spine in two places, a wound to the scrotum and a wound to the right lower leg. Wesley was conscious and in pain. Only one wound was non-life threatening. Dr. Deblieux testified that Wesley could have been in a state of shock after the shooting.
Dr. Susan Garcia, a forensic pathologist with the Orleans Parish Coroner's officer, performed the autopsy on Arnold Morris. Dr. Garcia testified that Morris sustained one shotgun wound and two gunshot wounds. The shotgun wound was the lethal injury. There was a side entrance wound three-fourths of an inch in diameter. The shotgun pellets entered the chest cavity. The victim suffered injury to his left lung and spleen, both of which had been surgically removed prior to death. Two gunshot wounds in one of the victim's legs were not fatal. Dr. Garcia said two different types of weapons were used.
Homicide Detective Jerry London took over the investigation from Detective Marco Demma. Upon arrival at Charity Hospital, Detective London viewed Morris' truck and noted four bullet holes in the driver's side of the truck. A pellet was recovered from the floor of the truck. The detective observed blood in the bed of the truck. London conducted the photographic lineups of the defendants. London stated that Wesley identified the defendants as the perpetrators. A photographic lineup was also conducted with Charles Gatson but he was unable to identify the perpetrators. London then arranged for the arrest warrants for the defendants. The *1082 officer noted that the police had received information from a Crimestoppers call identifying the defendants as the persons responsible for the shootings.
Officer Kenneth Leary, Jr., a firearms examiner with the New Orleans Police Department Crime Lab, was stipulated to be an expert in ballistics and the use of firearms. Officer Leary testified that the casings found on the scene were all fired from the same weapon. In addition, the bullets taken from the scene and the bullets taken out of Wesley were fired from the same weapon.
Gala Hayes, Ernest Allen's sister, testified that on March 29, 1992, she left for work at 7:00 a.m. At that time, defendant Allen and her son were at home together. When she returned home from work the defendant was still at her house. The defendant did not leave her house that evening. Ms. Hayes noted that the defendant had been on the telephone that evening. The defendant's middle name is Michael and sometimes goes by the name of Michael Hayes. The witness had never heard of her brother being called "Mike-Mike."
Glory Wells, Ernest Allen's aunt, stated that she took Gala's son, Eric, to church with her on the morning of March 29, 1992. When she dropped Eric off at Gala's house after church, the defendant was at the house. Ms. Wells testified that Eric did not live with his mother, but instead lived with his grandmother at that time. Ms. Wells also stated that the defendant is known as Michael Hayes. She had never heard of the nickname "Mike-Mike" used for the defendant. Eric Morgan, Gala Hayes' son, corroborated his mother's and aunt's testimony about his uncle's presence at the house on the evening of March 29, 1992.
Carla Nelson testified that she was on the telephone with defendant Ernest Allen at approximately 5:00 p.m. Ms. Nelson, who lives near the area where the shooting took place, stated that she heard gunshots while she was on the telephone with defendant Ernest Allen. Ms. Nelson did not see Ernest Allen that day. The witness acknowledged that she also knows George Cooks.
Beverly Cooks, George Cooks' sister, testified that on the evening of March 29, 1992, the defendant was in her presence. Between 4:00 and 6:00 p.m., the defendant was on her porch with a number of other people. Later that evening, they went to eat at a Sizzler Restaurant. Ms. Cooks also testified that she knows defendant Ernest Allen. She knows him by his nickname of "Mike-Mike." She does not know him by the name of Michael Hayes.
Keisha Hubbard was one of the people sitting on Ms. Cooks' porch the evening of March 29, 1992. She corroborated Ms. Cooks' testimony that George Cooks was with them that evening. Ms. Hubbard also stated that George Cooks went out to eat with them. Rashica Hall, George Cooks' girlfriend, was present with the defendant at Beverly Cooks' house that evening. Ms. Hall testified that she and the defendant ate at a Sizzler Restaurant with Ms. Cooks and several friends later that evening.
On rebuttal, Detective Angelo Smith, a New Orleans police officer assigned to assist the District Attorney's Office, testified that he attempted to speak with the defendants' alibi witnesses to no avail. However, Detective Smith spoke with Carla Nelson. Carla's sister, Tabitha, was present during Detective Smith's conversation with Carla. Tabitha told Detective Smith that George Cooks was her boyfriend and that she was on the telephone with him between 4:30 p.m. and 4:45 p.m. on March 29, 1992.
The trial court granted the defendants' request for surrebuttal. On surrebuttal, Tabitha Nelson testified that she recalled Detective Smith's conversation with her sister. Tabitha stated that she told Detective Smith that she was George Cooks' girlfriend and that she tried to call him between 4:50 p.m. and 5:00 p.m. Will, a friend of George's, answered the phone and told her that George was on the porch. Will would not let her speak with George because George had another girlfriend over. Ms. Nelson stated that she spoke with George later that evening.

*1083 Errors Patent (Pro Se Assignments and Cooks' Assignment No. 1):

A review of the record for errors patent reveals only one. As defendant Cooks contends, the trial court erred when it failed to grant the defendant's request for a delay of sentencing after the trial court denied his motion for a new trial. Code of Criminal Procedure article 873 provides that "[i]f a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled." The trial court, in the present case, proceeded to sentence the defendants immediately after denying defendant Cooks' motion for a new trial. However, any error in failing to wait twenty-four hours before sentencing the defendant for first degree murder was harmless as the sentence to be imposed was mandatory life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. See State v. Williams, 617 So.2d 557 (La.App. 3rd Cir.1993), writ denied, 623 So.2d 1331 (La.1993).

Allen's Assignment of Error No. 1 (and Pro Se sufficiency assignments):
In these assignments, the defendants argue that the state failed to produce sufficient evidence to prove, beyond a reasonable doubt, that the defendants were the perpetrators of the drive-by shooting.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.R.S. 15:438. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The defendants argue that the jury erred in accepting the testimony of Theodore Wesley given the inconsistencies between Wesley's testimony and the police report concerning the shooting incident. One such inconsistency is that Wesley described the perpetrators' truck as grey and black. However, the police report indicated that the suspects' truck was white. Officer Owens, the police officer who prepared the police report, admitted that she did not speak with Wesley. All information on the police report was relayed to her by another officer. She stated that she did not recall who told her the truck as white. Thus, it is extremely possible that Wesley never described the truck was being white in color.
The defendants also contend that Wesley's inconsistent statements concerning the location of his cousin, Charles Gatson, at the time of the shooting, the number of perpetrators, the involvement of someone named "Turon," and Wesley's use of Allen's nickname "Mike Mike" in the hospital are so extensive that Wesley's testimony should be considered as incredible. However, in actuality, these inconsistences are slight and can be explained. The inconsistences arise from the statement Wesley gave the police officer in Charity Hospital's emergency room. At the time Wesley gave the statement to Officer Gross, Wesley was probably in shock, having just been shot nine times. Thus, the fact that Wesley does not recall telling Officer Gros that there were four perpetrators as opposed to three or that someone named Turon may have been involved is indeed inconsequential. Wesley never stated definitively whether his cousin, Charles Gatson, was coming from the apartment courtyard or grocery store. Wesley *1084 saw Gatson coming from that general area as the shooting was occurring.
Furthermore, these inconsistencies were presented to the jury who heard and apparently chose to accept Wesley's testimony that the defendants were the perpetrators of the shooting. The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Price, 93-0625 (La.App. 1st Cir. 3/11/94), 636 So.2d 933, writs denied, 94-0742 (La. 6/17/94), 638 So.2d 1091 and 94-1566 (La. 10/14/94), 643 So.2d 159. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Rosiere, 488 So.2d 965 (La.1986).
In the case at bar, the jury was presented with the testimony of Theodore Wesley, the only eyewitness to the shooting. Wesley affirmatively identified the defendants as the perpetrators. Wesley gave Officer Gros the defendants' names while he was in the hospital. He later identified both men in a photographic lineup. The jury chose to accept this testimony in light of the alleged inconsistencies as brought out by the defendants. The jury weighed Wesley's credibility as well as the credibility of the defendants' alibi witnesses and found him to be more credible. The jury did not abuse its discretion in making such a determination. In accepting Wesley's testimony, there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the defendants were guilty of first degree murder.
We find no merit to this assignment of error.
Allen's Assignment of Error No. 2:
In this assignment defendant Allen contends that the trial court erred in not granting a mistrial when Theodore Wesley referred to other crimes and/or statements of the defendant. Allen argues that Wesley improperly referred to other crimes allegedly committed when Wesley testified about threats he was receiving.
The complained of testimony occurred during defense counsel's cross-examination of Theodore Wesley. Defense counsel was questioning Wesley's identification of the defendants in the photographic lineups provided by Detective London.
Q. O.K. And you knew both of them? It is your testimony you knew both of them?
A. Yes.
Q. So when you were shown those photographs, you were identifying somebody you knew?
A. I thought they were doing threats on my phone after they did it.
Q. Excuse me?
A. They was doing threats on my phone after they did it. They was bragging on it.
Immediately thereafter, defense counsel requested the trial court to admonish the jury to disregard the witness' remarks. The trial court admonished the jury to disregard the comments and instructed the witness to be responsive to counsel's questions. The trial judge noted that he didn't know what the remark meant. The trial court also granted the defendant's request to preserve his right to make his motion for a mistrial outside the presence of the jury. Thereafter, defendant requested a mistrial arguing that the admonition was not sufficient to cure the prejudicial effect of the statement. The trial court denied the motion for mistrial finding that the admonition was sufficient and that the statement was not "strong enough to prejudice" the defendant's case.
La.C.Cr.P. art. 771 provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or a comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or *1085 a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
The granting of a mistrial under C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515 (La.1982); State v. Feet, 481 So.2d 667 (La. App. 1st Cir.1985), writ denied, 484 So.2d 668 (La.1986). Mistrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the accused. The determination of whether prejudice has resulted lies within the sound discretion of the trial judge. Smith.
In the instant case, the trial court did not abuse its discretion in denying the defendant's motion for mistrial. The defendant contends that the witness' comments constituted references to other crimes. The witness stated only that he thought someone was threatening him. The witness's statement is not an unambiguous reference to a crime committed by the defendants. Furthermore, only three of the jurors heard the remark. The trial court admonished the jury to disregard the remark. The trial court's request for the jury to disregard such an innocuous statement was sufficient to insure that the defendant received a fair trial. The trial court did not abuse its discretion in finding that the admonition was sufficient and denying the defendant's motion for mistrial.
We find no merit to this assignment of error.
Cooks' Assignment of Error No. 2:
Defendant Cooks argues that the trial court erred in denying the defendant's motion to amend the indictment to delete an alias, denying the motion for mistrial based on the prosecutor's two references to the alias made during opening statement and denying the motion for mistrial based on references made by a prospective juror regarding alleged threats, resulting in the defendant's bad character being put at issue from the outset of the case and the defendant being denied a fair trial.
La.C.Cr.P. article 466 does not prohibit the state from using both the real name of a defendant and his alias in the bill of information. See State v. Bell, 581 So.2d 384 (La. App. 4th Cir.1991). Thus, the trial court did not err in denying the defendant's motion to amend the bill of indictment.
The defendant further contends that the trial court erred in denying defendant's motion for mistrial based on the prosecutor's references to the defendant's alias during opening statement. A mistrial is a drastic remedy and except in instances in which it is mandatory, is only warranted if substantial prejudice results which would deprive the defendant of a fair trial. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Deboue, 496 So.2d 394 (La.App. 4th Cir.1986), writ denied, 501 So.2d 229 (La.1987). Moreover, the trial court's rulings with regard to the scope of opening statement should not be disturbed absent a manifest abuse of discretion. State v. Denney, 352 So.2d 204 (La. 1977).
If the appellate court finds that the prosecutor's argument contained improper remarks, a reversal is warranted only if the court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Jarman, 445 So.2d 1184 (La.1984). Credit should be accorded to the good senses and fairmindedness of jurors who have heard the evidence. State v. Dupre, 408 So.2d 1229 (La.1982); State v. Deboue, supra.
A review of the portion of the state's opening statement which was transcribed reveals that the state only referred once to the defendant's alias. The statement was not an unambiguous reference to another crime. In fact, the reference to the defendant's alias came after the prosecutor stated the events *1086 which led up to the identification of the defendants as the alleged perpetrators.
BY MR. BILLEAUD:
* * * * * Teddy will tell you, as well as Jerry London who is later assigned the case that Detective London went to the home of Teddy Wesley after. After having been given the names of the perpetrators of this incident, that wasn't good enough. He will testify that he was presented two photo lineups. And in those photo lineups, he positively identified the two shooters, Earnest Allen and George Cooks. He identified them in the emergency room. He identified them by the photos. At that time, Jerry London prepared the arrest warrants for the arrest of Earnest Allen, A/K/A Mike-Mike and Michael Hayes, as well as George Cooks, A/K/A Lawrence Kelly. * * * * *
As the prosecutor's statement was not a reference to another crime, or improper in any manner, the trial court did not err in denying the defendant's motion for a mistrial.
The defendant also suggests that the trial court should have granted his motion for mistrial sought after a prospective juror made prejudicial comments which affected the entire panel. The prospective juror, Ms. Farley, stated during voir dire that she would have a difficult time finding someone guilty of a drive-by shooting.
BY MR. BILLEAUD:
Same question, ladies and gentlemen, regarding if any of you come in here with any life experiences that would prohibit you from sitting as a fair and impartial juror? Yes, ma'am?
BY JUROR FARLEY:
If, in fact, this case involves a drive-by shooting, I would have a very hard time voting someone guilty for an offense like that. I would fear retribution. I have a mother. I have a child. So my primary responsibility is to protect them and to make sure I'm around to do that.
BY MR. BILLEAUD:
I appreciate your candor. I understand.
BY THE COURT:
So you don't think you can be fair on a drive-by shooting?
BY JUROR FARLEY:
I don't think I would feel that I could vote guilty for someone who might take retribution against me.
BY THE COURT:
Oh, I see. So even if theyeven if you were convinced the defendants were guilty as charged, you don't think you could come forward with a verdict because of the fact that you have children and you can understand the get even situation. Is that right?
BY JUROR FARLEY:
I'm a little frightened of retribution in this case. If my child was grown and out the house, I would feel differently about it.
BY THE COURT:
Oh, you mean retribution as a juror?
BY JUROR FARLEY:
Yes.
BY THE COURT:
Oh, now wait now. Hold on. Madam, never in the history of this building has anythinghas any juror beenhad any problem whatsoever withand I've been in the building for twenty-two years. And I have read about the history of the building for many years before that. Now, you know, I'm not trying to tell you that you've seen a lot of T.V. obviously and you've read a lot of books, I'm sure. But that's notsee, I can't let that go unsaid because now you've told everybody else what's in your mind. And I don't believe that's a good reason. All right?
BY JUROR FARLEY:
I'm sorry.
BY THE COURT:
And if that were the case, I mean, you're going to have to see me after the trial because I can't let that go. Never in my wildest dreams would I ever put a juror in any danger whatsoever. Now, I'm notI don't wantI'm not asking for a response, please. I mean I've been a prosecutor, a private attorney, and a judge. And, you know, for me to say that will never happen, sure, I'm sure somewhere on earth it probably did. But they don't even make movies about that. And, you know, I just can't *1087 accept that. I wouldn't be able to get a jury if that were the situation. I compare jury dutyand maybe you never heard me this month say thatI compare jury duty second only to military service in the service of their community, people who are on the front lines, protecting their country, second only to them. That's how important I think it is. And that's why you're drafted and not invited. Because if I invited, I'd have nobody. Please, ladies and gentlemen, this is not a show. This is very, very serious. I don't invite people down here. I order them down here under pain of contempt of court. Now you are telling me that you would not come forward with a verdict, even though you thought the defendants were guilty, that you would not come forward with a verdict because you were afraid.
BY JUROR FARLEY:
I am saying it would color my judgment.
BY THE COURT:
I can't hear you.
BY JUROR FARLEY:
I am saying it would color my judgment.
BY THE COURT:
But if you're worried about your children, you're worried about raising your children, but you would let guilty people on the street. They're killing the children. I don't want any more of this. I'll talk to the lady after.
(Voir Dire Transcript, pp. 2-4)
The juror's statements are not unambiguous references to crimes committed by the defendant. The juror's comments do not suggest who may make such alleged threats or that she has in fact received any threats. Further, any improper or prejudicial remarks made by the juror was cured by the trial court's extensive discussion and admonition to Ms. Farley and the other prospective jurors. Thus, the trial court did not err in denying the defendant's motion for mistrial.
We find no merit to this assignment of error.
For the foregoing reasons, we affirm the defendants' convictions and sentences.
AFFIRMED.
NOTES
[1] Defendant Cook filed a motion to amend the bill of indictment to remove his alias. The trial court denied the motion on January 4, 1993. The defendant sought supervisory writs of review from this Court. On February 16, 1993, in writ 93-K-0168, this court denied the defendant's application for supervisory writs.