| BYRNES, Chief Judge.
STATEMENT OF CASE
On October 15, 1998, the defendant was indicted for the aggravated rape of his stepdaughter, C.M.[1], from September 3, 1984 through August 10, 1985 when she was under the age of twelve. La. R.S. 14:42(4).
A number of pretrial motions were heard, including a motion to suppress defendant’s written acknowledgement of paternity. The state filed an opposition. On July 22, 1999, the trial court granted the defendant’s motion. The state filed a motion to reconsider the ruling, and the trial court granted the motion to reconsider. The defendant applied to this court for supervisory review, and this court ordered the trial court to evaluate the overall vol-untariness of the defendant’s statements pursuant to La. R.S. 15:451, citing State v. Gilliam, 98-1320 (La.App. 4 Cir. 12/15/99), 748 So.2d 622.
On September 20, 2000, the trial court heard argument and subsequently issued a per curiam finding the defendant’s confession voluntary pursuant to La. R.S. 15:451. The trial court focused on the facts that it was the victim who informed the police of the defendant’s confession | g.of paternity, not the support enforcement office, and *347 the attorney for the support enforcement office was not acting as a criminal investigator or law enforcement officer when she obtained the confession. The defendant’s application to this Court for supervisory review was denied.
The trial court conducted a hearing to determine if the testimony of the defendant’s son, M.F., that he had intercourse with C.M. once or twice sometime in 1983, 1984, or 1985, should be admitted. The trial court ruled the testimony inadmissible under La. C.E. art. 412.
On January 20, 2001, after a three-day trial, a jury found defendant guilty as charged. On April 30, 2001, he was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence, with credit for time served. The defendant moved for a new trial on the following grounds: newly discovered DNA evidence; the trial court’s failure adequately to instruct the jury on the law of confessions and the weight of DNA evidence in civil paternity proceedings; the state’s failure to move for admission of DNA evidence and to complete the eviden-tiary foundation; and juror misconduct. The trial court denied the motion. This appeal follows.
STATEMENT OF FACTS
At trial, L.P. testified that C.M. was born on August 11, 1973. L.P. testified that she had two children, including C.M., when she married the defendant, a pastor at her church, on January 9, 1982. After the marriage, C.M. called the defendant “Daddy”. On the third Sunday in October 1982, the defendant baptized C.M. when she was nine years old.
During the marriage, L.P. worked outside of the home, and her mandatory hours were 8:00 a.m. to 4:40 p.m., Monday through Friday and she sometimes worked on Saturdays. The defendant worked as a self-jemployeda mechanic and a pastor with a schedule flexible enough to allow him to take much of the responsibility of caring for the children. L.P. testified that there were times when C.M. was left alone with the defendant. L.P. also testified that on one occasion, she saw the defendant leaving C.M.’s bedroom wearing only his briefs.
C.M. testified that the defendant began fondling her on the night of her baptism in 1982. The defendant made C.M. watch as he masturbated and made her assist him in the process. When C.M. was ten years old, the sexual activity progressed to intercourse at a rate of at least three times a week and continued until C.M. discovered she was pregnant in September or October 1985. C.M. testified that during the sexual activity the defendant would say “... daddy won’t ever hurt you. Daddy gonna always take care of you. You know, you just should never tell your mom ‘cause it would kill her.’ ”
L.P. testified that she noticed her daughter steadily gaining weight but thought it was due to overeating and heredity. L.P. stated that her daughter had her first menstrual cycle in February 1985. When her daughter missed three consecutive menstrual cycles, L.P. became concerned. A pediatrician she consulted assured her that it was normal for young girls to have non-continuous cycles. C.M. testified that after the visit to the pediatrician, the defendant made her drink a mixture of olive oil and vinegar and douche in the bathroom, saying it would help the problem.
. L.P. first feared her daughter was pregnant when she saw .her daughter in the bathtub and noticed the shape of her stomach and stretch marks on her breasts. In October of 1985, L.P. took her daughter to an obstetrician/gynecologist who confirmed that C.M. was approximately seven months *348 pregnant. L.P. suspected the father was C.M.’s cousin J.H., who |4was approximately sixteen years old at the time, and concluded that the pregnancy was the result of the cousins’ “playing house”. L.P. testified that in December 1985, the defendant left the family home for fear of being thought of as the father of C.M.’s child. C.M.’s daughter, C.“Q”.M.M., was born on January 1, 1986. No father’s name was placed on the birth certificate at the urging of L.P.
By 1998, C.M.’s daughter was curious about the identity of her father, and C.M. reluctantly provided the support enforcement office with the name of her cousin, J.H. J.H. took a paternity test, and the DNA results excluded him as a possible father. After the test results, C.M. went to the police to report the abuse by the defendant, and the police told her she needed evidence. C.M. returned to the support enforcement office and provided the defendant’s name when asked if there was any other person who touched her or had intercourse with her.
The defendant submitted to a paternity test, and the original test (RFLP) did not exclude him as the father of C.M.’s daughter. The support enforcement office, based on the paternity test results, sent the defendant a letter requesting that he come in to the office to discuss the test results. Linda Conerly, an attorney with support enforcement, testified that she met with the defendant on August 4, 1998 to discuss the matter of establishing paternity of C.M.’s daughter. Conerly testified that she does not call a father in unless the test results indicate a 99.99% or greater probability of paternity. She testified that she uses a standard explanation with each putative father due to her heavy caseload and the need to simplify the results of DNA paternity tests. After reviewing the DNA test results, Conerly customarily asks the individual if he “is comfortable” that he is the father; if so, she then asks if he would like to sign the acknowledgment of paternity. If the |Rindividual agrees to acknowledge paternity, she reads the form to him to make sure he understands the legal nature of the proceeding and his right to obtain counsel.
Conerly testified that she followed her standard procedure with the defendant as she explained the DNA paternity test, the defendant’s test results, and the probability that the defendant was the father of C.M.’s daughter. She also testified that the defendant’s wife accompanied him to the meeting. After Conerly advised the defendant that he could seek counsel, he declined and proceeded with the acknowl-edgement of paternity and consent judgment. Conerly then read the voluntary acknowledgment of paternity form to the defendant and explained the legal process. The defendant executed an acknowledgement of paternity and a consent judgment, which were filed in the civil paternity suit.
Conerly testified that she was not aware of C.M.’s age at the time the child gave birth. As a support enforcement attorney, she is interested in the age of the child because if the child is eighteen, she cannot take action; and she is interested in the age of the father because she will be filing suit.
On cross-examination, Conerly explained her role as an attorney for support enforcement within the context of the rales of professional conduct. She explains to the putative father that she represents the state in child support enforcement cases and that he has the right to obtain counsel. If the putative father declines to seek counsel, she specifically tells him that she is not his attorney and is not providing him legal counsel. She does not tell a putative father that DNA test results prove paternity; rather she asks if he believes the test *349 results; if he believes he is the father; and if he is willing to acknowledge paternity,
| ^Furthermore on cross-examination, Conerly testified that she did not provide C.M. with a copy of the acknowledgment of paternity and consent judgment; in fact, she had no direct contact with C.M. at any time because mothers such as C.M. work with the intake department, which is separate from her office. Conerly also testified that she did not provide copies of the documents to the police, does not know the detective who worked this case, and did not know or assist any police officer in obtaining copies for the purpose of securing an arrest warrant.
Detective Darrell Smith testified that C.M. brought the paternity test results to him, and based on those results, he obtained an arrest warrant for the defendant. Post-arrest, the defendant took a more specific paternity test (PCR), and the test results indicated a 99.9999993 percent probability that the defendant is the father of C.M.’s daughter.
The defense presented character evidence from defendant’s church secretary and testimony from his current stepdaughter and one of her friends that the defendant had not touched them inappropriately-

ERRORS PATENT

A review of the record for errors patent reveals none.

FIRST ASSIGNMENT OF ERROR: The trial court erred in admitting the defendant’s acknowledgment of paternity from a civil suit.

Defendant argues that the acknowledgment was not signed freely and voluntarily pursuant to Miranda warnings. He also argues that the support enforcement services attorney who obtained the defendant’s acknowledgment of paternity was acting as an agent of the police, and she was required to follow the same standards as any other officer. Furthermore, the support enforcement attorney was barred from questioning the defendant Jjand securing a consent judgment from him because he was not represented by counsel.
The state argues that the acknowledgement was signed freely and voluntarily in a noncustodial situation that did not require Miranda warnings; that the support enforcement sendees attorney was acting in that capacity only and at no time held herself out to be a law enforcement officer; and that the support enforcement services attorney informed the defendant of his right to be represented by an attorney and to a court hearing and read to the defendant the voluntary acknowledgment of paternity form and the rights and responsibility form. The defendant did not invoke his right to be represented by an attorney and did not seek legal advice or counsel from the support enforcement services attorney.
We find that the defendant was in a noncustodial situation under the facts of this case. The determination of a statement’s admissibility is within a trial court’s discretion, and it should not be disturbed unless it is not supported by the evidence. State v. Toney, 99-1574 (La.App. 4 cir. 11/8/00), 796 So.2d 1, 6, writ den. 2000-3474 (La.11/16/01), 802 So.2d 619.
State v. Saltzman, 2002-1350, p. 2-4 (La.App. 3 Cir. 4/23/03), 843 So.2d 1206, is inapposite. Saltzman addressed similar arguments made by the defendant, in which the appellate court reversed in part the trial court’s denial of the defendant’s motion to suppress all statements, confessions, and physical evidence obtained during his meeting with a child protection investigator, but the facts in Saltzman were different from those in the instant *350 case. Significantly, in Saltzman, a law enforcement officer was present when the defendant was questioned by the child protection . investigator. While the law enforcement officer did not ask any ^questions, he listened as the defendant made incriminating statements during the course of the interview.
[0]ur next inquiry is whether the defendant had undergone a custodial interrogation. In Miranda, the Supreme Court defined “custodial interrogation” as “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” 384 U.S. at 444, 86 S.Ct. at 1612. “[T]he only relevant inquiry in determining whether there was a formal arrest or a restraint on the freedom of movement of the degree associated with an arrest is ‘how a reasonable man in the suspect’s position would have understood the situation.’ ” Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). Accordingly, in order to determine whether the defendant was in custody, the court must consider whether a reasonable person in the defendant’s circumstances would have understood his conversation with the probation officer to constitute a restraint on freedom of movement of the degree associated with formal arrest. State v. Maise, 00-1158, pp. 10-11 (La.1/15/02); 805 So.2d 1141, 1149.
[[Image here]]
In Miranda, the Supreme Court summarized its holding as follows:
Our holding will be spelled out with specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming form custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. [Footnote omitted].
Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).
Saltzman, 2002-1350, p. 2-4, 843 So.2d at 1208-09.
The Saltzman court found that the defendant had been subjected to a detention based on the following reasoning:
I a[The child protection investigator] was acting as an agent of law enforcement. Although he did not ask questions, Detective Primeaux was present during the interview and took notes. The defendant was aware that Detective Primeaux was a law enforcement officer and was obviously aware of his authority to arrest the defendant. There is no evidence that the defendant was told at anytime that he was not under arrest and was free to leave. The interview of the defendant took one to two hours, during which [the child protection investigator] used accusatory language toward the defendant. The defendant was told that he was lying and had better start telling the truth. Furthermore, the very nature of the interview would have caused a reasonable person to believe they were the only suspect and the investigation focused on them. Thus, we find the entire interview was a detention [2], and the defendant should have *351 been Mirandized, prior to making these statements.
Id., p. 6-7, 843 So2d at 1210-11.
This Court does not necessarily agree that the facts in Saltzman constituted a detention. Regardless, the facts of the instant case are so different from those of Saltzman, that even were this Court to endorse the holding in Saltzman, it would not support the defendant’s arguments in the instant case. In the instant case, the child support enforcement attorney spoke with the defendant without the knowledge, presence, or influence of a law enforcement officer. The trial court addressed this issue in the hearing on remand from this court and focused on the fact that the victim approached child support enforcement; the agency conducted the interview; the defendant was advised of his right to seek counsel and declined; and the victim, not the child enforcement support attorney, advised law enforcement of the defendant’s acknowledgement of paternity. The facts of the instant | incase do not support a finding that the defendant was under arrest, in custody or under detention. State v. Maise, 2000-1158 (La.1/15/02), 805 So.2d 1141. As the defendant in the instant case was not under arrest, not in a custodial situation, and not under detention during the interview, Miranda warnings were not necessary.
The defendant’s last argument on this issue is that the support enforcement attorney had an ethical duty to refrain from questioning the defendant because he was not represented by counsel. During the course of the interview with the defendant, the support enforcement services attorney informed the defendant of his right to be represented by an attorney and to a court hearing. She also read to the defendant the voluntary acknowledgment of paternity form and the rights and responsibility form. The defendant did not invoke his right to be represented by an attorney and did not seek legal advice or counsel from the support enforcement services attorney. Thus, there was no error in denying the defendant’s motion to suppress his confession.

SECOND ASSIGNMENT OF ERROR: The trial court erred in excluding the testimony of M. F., the defendant’s son, who alleged he had a sexual relationship with the victim when he was a minor sometime during 1983,1984, or 1985.

The state argues that M.F.’s testimony was so vague as to warrant exclusion under La. C.E. art. 412, which requires evidence of prior sexual conduct to be within seventy-two hours of the charged act.
La. C.E. article 412 provides that when an accused is charged with a crime involving sexually assaultive behavior, reputation or opinion evidence of the past sexual behavior of the victim is not admissible. The statute It provides that “evidence of specific instances of the victim’s past sexual behavior is also not admissible except for ... [evidence of past sexual behavior with persons other than the accused, upon the issue of whether or not the accused was the source of semen or injury; provided that such evidence is limited to a period not to exceed seventy-two hours prior to the time of the offense.”
M.F. testified that he had intercourse with the victim once or twice sometime in 1983, 1984, or 1985. He could not recall *352 the specific year, much less whether it was within seventy-two hours of the alleged intercourse between the defendant and the victim. M.F.’s testimony clearly did not meet the requirements set forth in La. C.E. art. 412. This assignment is without merit.

THIRD ASSIGNMENT OF ERROR: The trial court erred in failing to declare a mistrial when the state, during closing arguments, repeatedly characterized defense counsel’s role as one requiring the suborning of perjury, misleading the jury, and confusing the jury.

In State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, the Louisiana Supreme Court discussed the scope of closing argument and the standard of review:
The general rule concerning the scope of closing arguments is that they are confined to ‘evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.’ Louisiana jurisprudence on pros-ecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. Further, the trial judge has broad discretion in controlling the scope of closing argument. And, even if the prosecutor exceeds these bounds, the court will not reverse a conviction unless ‘thoroughly convinced’ that the argument influenced the jury and contributed to the verdict.
Casey, 99-0023, p. 17, 775 So.2d 1022, 1036 (internal citations omitted).
|iaLa.C.Cr.P. art. 770 sets forth the prejudicial remarks that form the basis of a mandatory mistrial:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A mistrial may be declared when “prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial.” La.C.Cr.P. art. 775. Mistrial, however, is a drastic remedy and proper only when misconduct deprives the defendant of any reasonable expectation of a fair trial. State v. Bradford, 2002-1452, p. 21 (LaApp. 4 Cir. 4/23/03), 846 So.2d 880, citing State v. Miller, 93-1096 (La.App. 4 Cir. 5/17/94), 637 So.2d 1115. A decision on whether prejudice has resulted lies in the sound discretion of the trial judge. Bradford, 2002-1452, p. 21, 846 So.2d at 893, citing State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078.
Closing Argument: Comment Number 1
The first portion of closing specifically referenced by the defendant is as follows:
By Mr. Burns [the ADA]:
*353 The most compelling person that the Defense presented to me from what I contend is a ministry of manipulation was the stepdaughter. Did you notice the way she testified? Did you notice when I asked her had she ever — see ‘cause when you’re sitting right here you can’t see that table over there. Have you ever seen him in his underwear, his drawers, huh?
By Mr. Wainwright [defense counsel]:
| ^Mistrial.
By the Court:
Denied.
By Mr. Wainwright:
Judge I’d like the record to reflect that Mr. Burns is on the witness stand, he’s intimating to the jury that I was communicating answers the way he knows he does.
By the Court:
Ladies and gentlemen, again, I’ll instruct you. What you’re to decide this case came from the witness stand during the trial. This is strictly the lawyers’ interpretation of the evidence that they’ve presented to you. Strictly that. Just their words.
This portion of the state’s closing argument refers to the testimony of Nathelda Baham, the stepdaughter of the defendant from a subsequent marriage. The quoted comments do not fall within any of the categories of prejudicial remarks described in the four numbered subparagraphs under La.C.Cr.P. art. 770. The question is whether the remarks provide grounds for a mistrial as “prejudicial conduct in or outside the courtroom” to an extent that it becomes “impossible for the defendant to obtain a fair trial,” under La. C.Cr.P. art. 775.
During cross-examination, the assistant district attorney stood between the witness and defense counsel in a purposeful attempt to obstruct the line of vision between the two. The defense objected, and the trial court admonished both counsel to stop the theatrics or she would restrict both counsel to their seats. The state argues that coaching of a witness is one interpretation of the comment made during closing argument, and prosecutors have wide latitude in making closing arguments. The state appears to be correct: the assistant district attorney could have been commenting on the overall credibility of the defense witness. Assuming for purposes of argument that the state exceeded the bounds of closing argument, such excess was not beyond what could be cured by the proper instructions, which were, in fact, given by the trial court to the jury |,immediately after the objection. Thus, this portion of this assignment of error is without merit.
Closing Argument: Comment Number 2
The second portion of closing specifically referenced by the defendant is as follows:
By Mr. Burns:
... Look at this one. And I don’t make loose allegations against attorneys; it’s something I don’t do. But what the doctor told you as he sat on the witness stand, I don’t even know where that thing came from, why it was produced. And Mr. Wainwright said, you’re not insinuating that I generated this, and the doctor was like, of course not.
Again, this comment must be evaluated under La.C.Cr.P. art. 775 rather than La. C.Cr.P. art. 770. The defense does not provide a reference outside of closing argument, but the state points out that this argument refers to Dr. Murray’s testimony regarding the DNA paternity testing of J.H., a cousin C.M. initially named as the *354 father of her daughter.[3] The defense, however, did not object during closing to this statement by the state. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error. La.C.Cr.P. art. 841(A). Thus, this portion of this assignment of error was not preserved for appeal.
Closing Argument: Comment Number 3
The third portion of closing argument specifically referenced by the defendant is as follows:
By Ms. Maloney [ADA]:
It is Mr. Wainwright’s job to stand before you and mislead you and confuse you and do anything to earn the fee that he was paid.
By Mr. Wainwright:
11fiMistrial.
By the Court:
Denied.
By Mr. Wainwright:
This is improper argument. It’s been adjudicated by many appellate courts and I don’t know what she thinks she’s doing at this point, Judge -
By the Court:
Keep to the evidence, Ms. Maloney.
Again, this comment does not fall under La.C.Cr.P. art. 770 and will be evaluated under La.C.Cr.P. art. 775.
The defendant cites State v. Duplessis, 457 So.2d 604, 610 (La.1984) in support of his argument that a personal attack on defense counsel in closing argument is grounds for granting a new trial. In Du-plessis, the court stated:
This court seldom reverses convictions on the basis of prosecutorial argument (because jurors are generally told repeatedly that they must decide the case on the evidence and that arguments of counsel do not constitute evidence). In the present case, however, the effect on the jury’s evaluation of evidence caused by the errors during closing argument, when cumulated with the effect of the errors during voir dire, simply cannot be said to be harmless. Under any concept of fundamental fairness, the judicial system cannot allow to stand a guilty verdict reached by a jury exposed to such prejudice as to preclude a fair determination of guilt or innocence based on the acceptance or rejection of the identification evidence.
The court in Duplessis, however, viewed the personal attack on defense counsel in the context of the prosecutor commenting on excluded evidence during closing arguments:
The closing argument by the prosecutor drew four objections. The first one (the least prejudicial impropriety) occurred when the prosecutor told the jury that most convictions were based on only one identification witness, an argument clearly outside the record in this case. When defense counsel objected and requested an admonition, the trial judge neither sustained the clearly correct objection nor gave the clearly called-for admonition, but only stated that he could not comment on the evidence.
*355 Immediately thereafter, the prosecutor commented that a bus full of witnesses would not be enough for defense counsel because he was a “very skillful lawyer”. When defense counsel 11fiproperly objected to the personal argument about defense counsel (clearly exceeding the statutory limitation confining argument to the evidence or lack of evidence or reasonable inferences drawn therefrom) and asked for an admonition to the prosecutor to discontinue such tactics, the judge again neither sustained the objection nor gave the admonition, but again made the totally irrelevant statement that he could not comment on the evidence. To compound the error, the trial judge requested that defense counsel not interrupt the argument again.
The most egregious instance of improper prosecutorial argument occurred during rebuttal argument when the prosecutor told the jurors that defense counsel had them removed at one point in the trial because he did not want them to hear the witness’ answer. Although such an argument was clearly improper, the trial judge again declined to sustain the objection and merely told the jury that he could not comment on the facts.
The prosecutor’s first comment on evidence outside the record might be excused as innocuous, but the prosecutor’s comment on evidence which was excluded from the record is flagrant and inexcusable. Such deliberate misconduct makes a mockery of the rules of evidence and defeats the purpose for excluding unreliable evidence in the first place. Such comments may also lead the jury to believe that defense counsel was using technical objections to conceal his client’s guilt.
Finally, the prosecutor concluded his argument with a blatant appeal to prejudice by predicting the dire consequences in case of acquittal. The trial judge, instead of sustaining the objection and admonishing the jury to disregard such comments, told the jury that the function of closing arguments was to aid them in reaching a verdict. Even more damagingly, he chastised defense counsel in front of the jury for interrupting closing argument.
When such blatantly defiant tactics by the prosecutor are permitted, the result is the frustration of a criminal justice system which is designed to insure that a person is sent to prison only after being convicted on the basis of a jury’s fair (and not prejudicially influenced) evaluation of reliable evidence. In the present case, such tactics were not only permitted, but were actually approved when the trial judge twice reprimanded the defense attorney for making proper and meritorious objections.
State v. Duplessis, 457 So.2d 604, 607-610 (La.1984). The court in Duplessis found reversal was necessary not because of the prosecutor’s personal attack on defense counsel but due to the cumulative nature of errors during closing argument. The trial judge in Duplessis permitted the 117prosecutor to make inappropriate comments, failed to give an admonition to the jury, and told defense counsel not to interrupt the prosecutor’s closing argument. In the instant case, the trial judge allowed defense counsel to object numerous times during closing argument, admonished the jury when appropriate, and cautioned the prosecutor to confine argument to the evidence.
The defendant also attempts to distinguish more recent cases, in which the prosecutor’s personal attack on defense counsel, albeit inappropriate, did not rise to the level of reversible error. In State v. Bridgewater, 2000-1529 (La.1/15/02), 823 *356 So.2d 877, the prosecutor made the following remarks during closing argument:
Well, he hires himself a good lawyer and he gets a lawyer that’s going to be able to take that intent thing and kind of twist it around and hope that he can play the odds — ... he knows that the odds aren’t good that all 12 of you are going to buy this nonsense that he had no intent to kill anybody.
Bridgewater, 2000-1529, fn. 32, 823 So.2d 877, 917. The court in Bridgewater found that while “prosecutors should refrain from personal attacks on defense strategy and counsel, a comment that suggests the state carried its burden despite defense attempts to show otherwise, even if improper, is not reversible error.” Bridgewater, 2000-1529, p. 33, 823 So.2d 877, 903.
The defendant in the instant ease argues that the comment in Bridgewater was not as egregious as that in the instant case. While the comment by the prosecutor in the instant case was more direct, the concept was the same: a personal attack on defense strategy and counsel, a comment that the state carried its burden of proof despite defense attempts to show otherwise. In the context of the trial court’s balancing of the prosecutor’s [18wide latitude during closing and the defendant’s right to an admonition as a result of impermissible argument, the defendant was not prejudiced.
The defendant also relies on federal jurisprudence, but one case addressed a prosecutor accusing a defense attorney in the presence of the jury of hiding relevant and material evidence. United States v. Murrah, 888 F.2d 24, 27 (5th Cir.1989). The other federal case cited by the defendant addressed whether the prosecutor improperly expressed an opinion as to guilt, discussed facts outside the record and mis-characterized testimony during closing argument. United States v. Montgomery, 210 F.3d 446, 454 (5th Cir.2000). The comments in the instant case did not involve accusations of hiding evidence, expressions of opinion of guilt, or discussion of facts outside the record. The issue in the instant case is whether the prosecutor waged a personal attack on defense counsel such that the defendant was prejudiced. The federal jurisprudence cited by the defendant is, therefore, not determinative of the issue. This portion of this assignment of error is without merit.

FOURTH ASSIGNMENT OF ERROR: The trial court erred in denying the defense’s requested instructions concerning the voluntariness of confessions and the weight to be accorded DNA evidence.

The defendant cites La.C.Cr.P. art. 807, which provides that the defense may submit a special written charge to be given to the jury if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. Such charge need not be given if it is included in the general charge or in another special charge. La.C.Cr.P. art. 807. Jury instructions must be considered as a whole, and the failure to give a requested charge is |1flnot reversible error unless it prejudices the substantial rights of the defendant. State v. Carter, 97-2902, p. 34, 37 (La.App. 4 Cir. 5/10/00), 762 So.2d 662, 683, 684.
The defendant references the following request for special jury instructions:
Instruction: (1)
Scientific testing alone is not sufficient to prove paternity, it is persuasive and objective testimony that can help establish paternity by a preponderance of the evidence. Probabilities by their nature are not conclusive. (LeBlanc v. LeBlanc, 497 So.2d 1361, 1364 (La.1986); State, Dept. of Social Services, Office of Family Support in Interest of James v. Passant, 97-26 (La.App. 3 Cir. 6/18/97), *357 698 So.2d 27; Didier v. Fasola, 597 So.2d 450 (La.App. 1 Cir.1991). Instruction: (2)
Although scientific testing, specifically deoxyribonucleic acid (DNA) and related tests, are becoming more reliable than earlier blood tests, neither statutory law nor jurisprudence mandates DNA testing as the sole factor in determination of paternity; blood tests are just one factor to be weighed by the trier of fact. State Through Dept. of Social Services v. Dorsey, 95 0446 (La.App. 1 Cir. 11/9/95), 665 So.2d 95.
Both requested instructions relate to DNA evidence and the burden of proof in civil paternity actions. Neither expressly addresses confessions and the weight to be accorded confessions. The trial court denied the requested instructions because both reflect the preponderance of the evidence standard used in civil paternity proceedings. The trial court instructed the jury that the burden of proof in a criminal trial is beyond a reasonable doubt. The trial court also instructed the jury on DNA evidence within the context of expert witness testimony as follows:
Expert testimony. Persons who because of special training and/or special knowledge in a particular field are recognized as experts in that particular field are allowed to give expert opinions in that field. This rule of law applies to testimony in regards to molecular biology and forensic paternity DNA testing and analysis. You should consider and weigh the testimony of an expert witness just as you would the testimony of any other witness. The weight and effect which the jury will give to the testimony of an expert will also depend on your | ^evaluation of the degree of knowledge and skill possessed by that expert. In this connection you are entitled to take into account the evidence as to the training, special study and experience of the experts.
The defendant was on trial for aggravated rape. He was not a defendant in a civil proceeding to establish paternity. The defendant’s proposed jury instructions, relating as they do to civil paternity suits, would have confused the jury. The trial court correctly instructed the jury on the role of the expert witness who presented the DNA evidence of paternity in the instant case, and the defendant was not prejudiced by the trial court’s denial of defendant’s proposed jury charges. This assignment of error is without merit.

FIFTH ASSIGNMENT OF ERROR: The trial court erred in denying the defense the right to question the jury foreman as to when he realized that he had represented the victim’s maternal uncle and, in a separate case, the victim’s later stepfather.

The defendant is referring to a hearing that took place on February 7, 2001, after the conclusion of the trial. The trial court ordered the hearing after being contacted by the jury foreman. This hearing was not conducted in connection with a defense motion for new trial as specifically represented by the defendant in his brief. In fact, the trial court noted at the start of the February 7, 2001 hearing that she called the hearing and that no motions were currently pending.
Juror misconduct is not grounds for an automatic mistrial; prejudice must also be established. State v. Richardson, 33,272, p. 16 (La.App. 2 Cir. 11/1/00), 779 So.2d 771, 783, citing State v. Ireland, 377 So.2d 299 (La.1979) and State v. Day, 414 So.2d 349 (La.1982). The trial court focused on the issue of prejudice, without making any finding of juror | ^misconduct. That analysis is not necessary because, assuming the foreman’s actions constituted juror miscon *358 duct, there was no showing of prejudice to the defendant.
The state and the defendant, with counsel, were present at the February 7, 2001 hearing. The trial court questioned the foreman but allowed neither the defendant nor the state to ask questions. The foreman testified that he recognized his former clients in the audience on two occasions during the trial and did not know or investigate why they were present. The foreman conferred with another attorney on the jury panel, and the two concluded that he did not need to notify the trial court because he did not know why his former clients were present in the audience. The foreman informed his law partner that if the former clients contacted the office regarding his presence on the jury, no information was to be given or received.
Only after the conclusion of the trial did the foreman contact his former clients to find out why they were present in the audience. At that point, the foreman, as an officer of the court, informed the trial court, and the hearing was held. The trial court specifically asked the foreman if he was aware during the trial or deliberations of any relationship between his former clients and the defendant; if he contacted his former clients during the trial; and if he was influenced during the trial or deliberations by the presence of his former clients. The foreman responded unequivocally in the negative to each question and stated that at all times he discharged his duty fairly and impartially.
It appears that the trial court adequately investigated the matter, and it is unlikely that any further questions by the defendant would have changed the foreman’s position that he acted fairly and impartially. The defendant | ggwas allowed to argue this issue in its motion for new trial, although the defendant was not allowed to call the foreman as a witness during the motion hearing. This assignment of error is without merit.

CONCLUSION

For the foregoing reasons, we affirm the defendant’s conviction and sentence.

CONVICTION AND SENTENCE AFFIRMED.

. We have identified the victim and her family by initials in order to protect their privacy.

. Saltzman notes that La. Const. Art. 1, § 13 employs the term "detained” rather than the word "custody”:
*351 When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel.

. Dr. Murray testified on direct examination for the state that J.H. was excluded as the father. The defense asked for a clarification of Dr. Murray's statement, and the trial court stated that he could inquire on cross-examination. On cross-examination, the defense showed Dr. Murray the report with the probability calculations on J.H., which was initialed by Dr. Murray. Dr. Murray testified that he had not recalled that probability calculations had been done on J.H. because ordinarily such would not have been done given the test results were not high enough to be reported. The defense proceeded to attack Dr. Murray's credibility on this point.