JOY COSSICH LOBRANO, Judge.
1 jThe defendant, Craig Ferdinand, was charged with first degree robbery, a violation of La. R.S. 14:64.1, and pled not guilty. Following a trial, the jury returned a responsive verdict of guilty of simple robbery, a violation of La. R.S. 14:65. Ferdinand filed a motion for new trial, which the trial court denied on January 13, 2010. On the same date, the trial *1268 court sentenced Ferdinand to three years at hard labor in the custody of the Department of Corrections.
The State filed a multiple bill alleging that Ferdinand was a second felony offender. After Ferdinand pled guilty to the multiple bill, the trial court vacated the original sentence and sentenced him to serve five years at hard labor in the custody of the Department of Corrections. Ferdinand appealed his conviction and sentence.
Robert Bowman testified that on March 14, 2009, he, his cousin, Billy Chedville, and his friend, Billy Arabie, traveled to New Orleans from Hammond, Louisiana. Bowman had received an income tax refund of eighteen hundred dollars, and he wanted to treat Chedville and Arabie to a night on the town in the French Quarter.
|2The group left Hammond after work and drove straight to Bourbon Street. They spent the next several hours drinking and socializing at several bars. Sometime after midnight, Bowman and Arabie lost track of Chedville. He later learned that his cousin had been arrested for public drunkenness. While looking for Ched-ville, Bowman and Arabie became lost and could not find their car.
Bowman testified that he was walking down Bourbon Street and talking on his telephone when felt someone pressing something hard into his back. The subject, later identified as Ferdinand, told him to give him all of his money. Bowman then felt Ferdinand reaching for his wallet. Bowman yelled, “Hey.” Before he could say anything else, Bowman was struck on the head and fell to the ground. Ferdinand then took off running with Bowman’s wallet.
Bowman gave chase. Ferdinand turned several corners and threw the wallet down as he ran. Bowman retrieved his wallet and continued to follow Ferdinand until he saw him enter a bar. Bowman followed him inside, where a verbal exchange between the two ensued, and then a bouncer made them leave.
At this point, one or more police officers were standing in the street outside the bar. Ferdinand began walking away. Bowman tried to grab him and called to the police at the same time. Ferdinand told the officers that he had just gotten off work and had never seen Bowman before.
Bowman told the officers that Ferdinand had taken one thousand five hundred dollars from him. The officers then searched Ferdinand and recovered that amount of U.S. currency.
Bowman identified several photos of himself taken that night by the police. He also acknowledged that he had a conviction for simple assault.
|3Sergeant Jimmie Turner testified that on the night in question he was patrolling in the 300 block of Bourbon Street when he observed Ferdinand approaching from his left at something less than a full run. Ferdinand then entered a nearby daiquiri shop. A short time later, Bowman approached from the same direction. He was staggering, appeared to be injured, and was bleeding from the eye. Bowman then entered the same establishment.
A short time later, Sergeant Turner’s attention was focused on the same establishment after he heard a commotion. Ferdinand and Bowman were engaged in a verbal altercation. As he neared, he heard Bowman say, “Give me my f — in’ money. Give me my money back.” As Sergeant Turner began to intervene, Bowman stated, “He took my money. Give me my money. He took my money.”
Sergeant Turner conducted an initial investigation by asking each of the individuals what had happened. Ferdinand relat *1269 ed that he had no idea what Bowman was talking about. He stated that he had never seen Bowman before and that he had just left work. On the other hand, Bowman stated that Ferdinand had taken one thousand five hundred dollars which should be in his possession. Sergeant Turner asked Ferdinand how much money he had in his possession and he said that he had approximately one thousand dollars. Sergeant Turner continued to question Ferdinand regarding his whereabouts that evening and why he had one thousand dollars on his person. Ferdinand then remembered that he had also been at the casino.
Sergeant Turner acknowledged that he smelled alcohol on Bowman’s breath and none on Ferdinand’s breath. Bowman did not state anything about having recovered his wallet. Also, he recalled that Bowman was not overly concerned |4with retrieving his wallet. He recalled that he said something to the effect that he could always get another I.D.
At this point, Sergeant Turner, with the assistance of Officer Ball, placed Ferdinand under arrest. Sergeant Turner then issued Miranda warnings. Later, Sergeant Turner asked Ferdinand how he got blood on his shirt and he responded that he was attacked by Bowman and his friend.
Officer John Ball testified that he accompanied Ferdinand back to the Eighth District Station after he was placed under arrest. Once there, he sat Ferdinand down and asked him what had happened. Ferdinand stated that he was jumped by two white males and that they tried to take his money.
Officer Ball asked Ferdinand if there were any more details, and he stated, “They jumped me. You could search me. I don’t have anything on me.”
Officer Ball searched Ferdinand and recovered one thousand five hundred and six dollars. Officer Ball stated that Ferdinand was dressed in a white shirt and a white apron and that both had blood spatter on them. He identified the clothing in court, as well as a cell phone that was recovered from Ferdinand. He also identified photographs of Bowman and the money that was recovered.
Ferdinand testified on his own behalf. He stated that during the early morning hours of the night in question he was at work at the Café Du Monde and was outside the restaurant on a break when he met Bowman. He stated that Bowman and Arabie approached him and engaged him in some idle chatter. He stated that they were quite friendly. Bowman then asked him whether he could get them some “party supplies.” Ferdinand asked Bowman if he wanted crack and he said no, that he wanted powder.
^Ferdinand told him that he could call someone for him, and asked him how much cocaine he wanted. Bowman replied that he wanted a large quantity, twenty-eight grams.
Ferdinand called an associate who said that he could supply the drugs. Ferdinand instructed Bowman and Arabie to meet him in front of the restaurant when he got off work, and they did. They walked to a bar called the Copper Monkey were the associate had told Ferdinand to meet him. They waited at the bar for approximately an hour for the associate to arrive. Ferdinand then completed the transaction and retrieved the cocaine. He stated that he paid the associate seven hundred and fifty dollars for the cocaine.
Afterwards, he showed Bowman the cocaine. After tasting it, Bowman relinquished fifteen hundred dollars, the agreed upon price. Bowman and Arabie then began examining the cocaine as Ferdinand *1270 walked away. Bowman then walked up to him stating that he wanted his money back. Ferdinand declined, saying it was a “done deal.” Bowman began to fight with him, and soon Arabie joined in. Ferdinand took off running.
Ferdinand stated that he entered the daiquiri shop and went into the restroom to see if he was injured. Bowman followed him into the restroom and began harassing him, saying that he wanted his money back.
On Ferdinand’s way out of the bar, Sergeant Turner saw the two men were engaged in a verbal altercation and became involved in the situation. Sergeant Turner didn’t ask Ferdinand anything and just placed him in handcuffs. Ferdinand claimed he never told the officers about the drug deal because he did not want to be arrested for selling drugs.
| fiFinally, Ferdinand admitted he had six misdemeanor convictions as well as two felony convictions for possession of cocaine and forgery.
A review of the record for errors patent reveals none.[1]
In his second assignment of error, Ferdinand contends that the evidence adduced at trial is insufficient to sustain the verdict. When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. When the entirety of the evidence both admissible and inadmissible is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignments of error to determine whether the accused is entitled to a new trial. State v. Hearold, 603 So.2d 731 (La.1992).
When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. Under the Jackson standard, the rational credibility 17determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2302, p. 5 (La.10/23/03), 857 So.2d 1024, 1027.
*1271 A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, supra, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573-74. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
In order to prove the crime of simple robbery, the State must prove beyond a reasonable doubt that the defendant acted in accordance with the circumstances identified in La. R.S. 14:65, i.e., “the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon.” State ex rel. T.T., 2009-1201, p. 2 (La.App. 4 Cir. 1/13/10), 30 So.3d 220, 221.
Ferdinand argues that little of Bowman’s story makes sense. He notes that even though Bowman was using his telephone at the time of the robbery, he failed to call 911 or attempt to alert any of the numerous police officers who were 1 ^patrolling the area. However, it is extremely difficult to fault the instinctual split second decision to give chase rather than to stay put and call 911. Bowman was undoubtedly concerned that if he lost eye contact with his robber he would never be apprehended and that he would never recover his money.
Ferdinand also suggests that Bowman’s initial statement to the police that he (Ferdinand) “took my money” established that no robbery was committed. Ferdinand points to the fact that Bowman did not tell the police that he had been robbed and he suggests that Bowman’s statement supports Ferdinand’s testimony, that the money was exchanged during the course of a drug deal. Ferdinand suggests that it was only later, after given time to reflect, that Bowman concocted the story that a robbery occurred.
The fact that Bowman failed to describe the events under the applicable legal definition of the crime which describes Ferdinand’s conduct is not significant. Bowman’s foremost concern was that Ferdinand was in possession of a considerable amount of his money and that he was willing to confront him alone, if necessary, to retrieve it. Furthermore, the sum of Bowman’s statements at the scene conveyed the sense that a forceful taking had occurred and that he had been robbed. Bowman was injured and bleeding from the eye and Ferdinand’s shirt and apron were stained with blood.
Ferdinand contends that the case is very similar to State v. Mussall, where the defendant’s conviction was reversed. In Mussall, the Louisiana Supreme Court affirmed the appellate court’s finding that no reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. Mussall, 523 So.2d at 1311. The eyewitness in Mussall was Ray Siebenkit-tel, who testified that he received a phone call at work from the defendant, Edward Mussall, who he had |9met once briefly a few years prior, and who tried to interest Siebenkittel in purchasing or investing in a boat.
Siebenkittel testified that he agreed to look at the boat after receiving repeated calls from Mussall over the next few weeks. “Although Siebenkittel said he had not seen the boat and did not know where it was located or who owned it, he testified that he liquidated his entire savings of $4,000, which he saved while working at minimum wage and living at home, *1272 and borrowed $2,000 from his sister at 18½% interest.” Mussall, 523 So.2d at 1311. Siebenkittel testified that he proceeded to drive to meet Mussall in the 700 block of Governor Nichols Street with $6,000.00 cash in an envelope at 8:00 p.m. on February 25, 1983. Id. at 1306-1307. According to Siebenkittel, as he and Mus-sall walked along Governor Nichols Street, Mussall pulled a handgun and robbed him of the $6,000.00.
After the alleged robbery, Siebenkittel testified that he drove to the First District Police Station, reported the crime approximately ten to twelve minutes later, and provided Mussall’s name, telephone number, and physical description to the police. On March 17, 1983, Siebenkittel identified Mussall from a photographic lineup, and a bulletin was issued for Mussall’s arrest.
The Louisiana Supreme Court noted that the State did not introduce any evidence to corroborate Siebenkittel’s testimony, and that “[t]here was no other witness to the robbery itself or to any fact in Siebenkittel’s version of his prior contact with Mussall.” Id. at 1307. Additionally, “[t]here was no corroboration of Siebenkit-tel’s withdrawal or liquidation of $4,000 savings or of a $2,000 loan from his sister at 18½% interest.” Id. Likewise, the State did not introduce the handgun, the cash, the envelope, “or any evidence that Mussall had ever possessed any of them.” Id.
ImMussall testified in his own defense, asserting that Siebenkittel fabricated the robbery story out of a desire for revenge from a failed drug deal with Siebenkittel and Jim W. Pace, Nicholas G. Felton, and Henry Canniglio, Jr. According to Mus-sall, Pace, Felton, and Canniglio fabricated a civil claim that Mussall had defaulted on a contract with them to sell shrimp and sought recovery of $45,000 for their investment in the venture, and Siebenkittel sued Mussall to recover $6,000 for the cash taken in the robbery and $100,000 in damages.
Mussall introduced documentary evidence of the two lawsuits filed against him, which were both filed on April 29, 1983, by the same New Orleans attorney; notably, “both petitions were verified in that attorney’s office on that day by the respective plaintiffs, and both suits were served that same day on the defendant at central lockup where he was being held on the armed robbery charge.” Id. at 1307. Siebenkit-tel insisted that he had never met Pace, Felton or Canniglio, and that he was unaware that they had filed a lawsuit against Mussall on the same day with the same attorney.
The Louisiana Supreme Court found that “in this particular case even a reasonably pro-prosecution rational trier of fact is driven to have a reasonable doubt by the numerous eccentricities, unusual coincidences and lack of corroboration,” concluding that the uncorroborated story was too far-fetched and would have created a reasonable doubt in the mind of a rational fact finder. Id. at 1311-12.
Likewise, Ferdinand argues that numerous eccentricities of Bowman’s testimony created a tale that no rational fact finder could have believed.
However, in State in the Interest of C.D., 2011-1701 (La.7/2/12), 93 So.3d 1272, the Louisiana Supreme Court recently emphasized just how unusual the fact Inpattern in Mussall was, stating that “Mussall stands as the single, sui generis, exception to that rule in this Court’s jurisprudence [that eyewitness testimony alone is usually sufficient], and it is distinguished by its truly bizarre facts.” Id. at p. 6, 93 So.3d at 1276.
The facts of this case present nothing of the order presented in Mussall. Here, *1273 although Bowman and Ferdinand presented two completely different versions of the events, the surrounding facts of the case cannot be credited as truly bizarre. The determination of whose testimony was worthy of belief is clearly within the province of the jury. This Court should not impinge on that determination. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the essential elements of the crime of simple robbery were satisfied beyond a reasonable doubt.
Ferdinand argues that by providing late notice of Bowman’s conviction for simple assault the State withheld evidence favorable to him in violation of the rule established in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1962). Ferdinand argues further that the late notice further deprived him of his Sixth Amendment right to present a defense and to confront the witness against him and impeach his credibility.
As noted previously, during Bowman’s testimony, the prosecutor asked him whether he had ever been convicted of a crime, and he replied that he had been convicted of simple assault, approximately one or two years before. Ferdinand then moved for a mistrial. He relayed that the night before trial he was provided with Bowman’s rap sheet which did not reflect any previous convictions.[2] The 112prosecutor stated that he was not aware of Bowman’s conviction and because his rap sheet showed no previous convictions he believed that was the ease. The prosecutor noted that as a precaution, prior to Bowman taking the stand, he asked him whether he had any convictions, which is when he first learned of Bowman’s assault conviction.
Ferdinand suggested that a mistrial was appropriate because he would have tailored his jury selection differently as well his cross examination preparation. He further suggested that his fundamental right to confront and cross examine his accuser was prejudiced.
In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that “the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment.” See also, La.C.Cr.P. Art. 718.
Evidence is material, and hence discoverable, if there is a “reasonable probability” that the outcome of the trial would have been different had the evidence been disclosed to the defense. U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
A defendant’s right to production of arrest and conviction records of state witnesses for impeachment purposes which satisfy Brady’s materiality standard is well recognized. See State v. Bowie, 2000-3344 (La.04/03/02), 813 So.2d 377.
We find no merit to Ferdinand’s first assignment of error. The record reflects that Bowman’s previous conviction was established at trial, and he was confronted with it; the jury was able to use the fact of Bowman’s conviction in weighing his testimony. In denying the motion for mistrial, the trial court noted as much, stating, “you still have the opportunity right now on cross-examination to | ]Sask this gentleman [Bowman] any and every question that you wish to ask him about his conviction.”
Furthermore, Ferdinand has not demonstrated that either his ability to prepare *1274 for trial or his actual defense was diminished by the late disclosure of Bowman’s criminal record.
For the reasons stated above, we affirm Ferdinand’s conviction and sentence.
AFFIRMED

. The denial of Ferdinand's motion for new trial occurred immediately prior to his initial sentencing on January 13, 2010, contrary to the requirement imposed by La.C.Cr.P. art. 873 that there be a twenty-four delay from the denial of a motion for new trial and sentencing (unless the defendant waives such delay). However, because Ferdinand’s original sentence was subsequently vacated, the error is moot.

. On the morning of trial, Ferdinand also filed a bill of particulars specifically requesting information as to Bowman's convictions, if any.