MAX N. TOBIAS, JR., Judge.
hThe defendant, Teddy Magee (hereinafter, “Magee” or “the defendant”), was charged by bill of information with one count of home invasion, a violation of La. R.S. 14:62.8 (count one), and one count of second degree sexual battery, a violation of La. R.S. 14:48.2 (count two). On 21 December 2010, he entered pleas of not guilty to both counts.
Magee filed a motion to suppress evidence and a motion to suppress statement. After several continuances, on 17 June 2011, the trial court denied both motions and found probable cause. An initial trial setting of 18 August 2011 was continued several times, and the matter was set for trial on 30 January 2012.
After a pre-trial motion hearing on 30 January 2012, a six-person jury found Ma-gee not guilty as to the violation of La. R.S. 14:62.8 and guilty as charged as to the violation of La. R.S. 14:43.2.[1]
Magee filed a motion for new trial on 3 February 2012, which the trial court denied. The state filed a multiple bill that same date. On 6 February 2012, the trial court sentenced the defendant to twelve years at hard labor as to count two, the 12violation of La. R.S. 14:43.2, to run concurrently with any other sentence, without benefit of probation, parole, or suspension, with credit for time served. The court notified the defendant that he must seek post-conviction relief within two years pursuant to La.C.Cr.P. art. 930.8. This timely appeal followed.
After a multiple bill hearing on 18 May 2012, Magee was adjudicated a fourth offender. The trial court vacated the previous sentence and sentenced the defendant to twenty years at hard labor pursuant to La. R.S. 15:529.1, to run concurrently with any other sentences, with credit for time served. The trial court again notified the defendant that he must seek post-conviction relief within two years pursuant to La.C.Cr.P. art. 930.8.

FACTS

Detective Bianca Deirish of the New Orleans Police Department (“NOPD”) testified that on 10 October 2010, she reported as the first responding officer to an apartment complex at 4109 Encampment Street in New Orleans. Although she could not recall the exact time of day, she recalled that it was daylight at the time, and that a female victim, C.B.,[2] and another woman were in an apartment on the second floor of the apartment building. Detective Deirish recalled that it appeared that a fight had occurred, that things had been turned over, and that the scene was “really nasty and gruesome” for it appeared from a trail of feces and blood that someone had been dragged from the toilet *950 and down the hallway to the living room. She stated:
When you walk in, there was feces. When you get to the living room there was feces on the carpet. There was feces on the sofa. The sofa set was like, an “L” | ashape, and there was [sic] hand prints, it looked like, with feces, in the feces. There was a lot of blood. That was the living room.
As you get to the bathroom, there was feces all across the floor leading to the hallway, into the bedroom. And there was feces on the bed, on the comforter, on the sheet, on the floor, along with blood and some other type of fluid.
Detective Deirish testified that she found C.B. lying on her back in the living room, partially covered with a small towel. She had blood and feces on her hands, legs, and feet. She also had blood on one of her toes, which was missing a toenail, and bruising on her neck, legs, inner thighs, and along one arm.
The detective spoke to C.B. regarding her injuries and asked who had inflicted the injuries upon her, but C.B. only provided vague answers and cried. When asked where she was hurt, C.B. responded by pointing at her buttocks and then touched her vaginal area. Detective Deirish stated that she asked C.B. what happened, and she said her ex-boyfriend assaulted her but refused to disclose his name. While at the apartment, the detective entered the bathroom and discovered several pieces of mail bearing Magee’s name at that address. The detective spoke to the other woman in the apartment, C.B.’s aunt, and also obtained the defendant’s name from her. Detective Deirish then asked C.B. about the defendant, at which time C.B. cried hysterically and put her head in her hands, unable to answer. The aunt’s statement was consistent with the vague account that had been provided by C.B. The detective observed the absence of signs of forced entry.
Detective Merrell Merricks of the Sex Crimes Division of the NOPD testified that when he arrived on the scene at 4109 Encampment Street on 10 14October 2010, C.B. had already been transported to the hospital. The Crime Lab was called to the scene, and photographs were taken.
Upon being asked to describe each room individually, Detective Merricks first described the bathroom, which he testified showed signs of a struggle, for the door had been forced open. He also observed a trail of blood and fecal matter on the bathroom floor, which continued on to the bedroom. In the bedroom, he observed a trail of blood and fecal matter on the floor that originated in the bathroom and blood and fecal matter on the bedspread and mattress. The trail of blood and fecal matter continued to the living room. He did not recall seeing anything broken at the scene, and observed no signs of forced entry into the apartment. However, Detective Mer-ricks observed signs of forced entry at the bathroom door, as the door frame appeared broken. He could not recall whether the door was splintered or whether the handle was out of position from its screws, and he did not believe that any of the Crime Lab photographs showed signs of forced entry on the bathroom door.
When asked whether a suspect had been developed by the time he arrived on the scene, Detective Merricks testified that Magee, who was the victim’s ex-boyfriend, was a suspect. Mail bearing the defendant’s name and the address of the scene was found in the bathroom. He spoke with C.B.’s aunt at the scene and asked her whether she knew the defendant. He also spoke with C.B. at the hospital, at which time he observed “strangulation marks around her neck, bruises to the face, to the, some bruising over her body *951 as well.” Detective Merricks testified that he also “observed a bite mark to her, to her buttocks, if I’m not mistaken, and [C.B.] had severe damage to her vaginal area as well.” He testified that when he visited C.B. in the hospital, “[s]he was crying, afraid, and in pain.” The detective Ifitestified that “[w]e never got to that point [of discussing whether or not she wanted to press charges] when I arrived at the hospital” and that C.B. did not indicate at that time that she wanted to press charges.
Detective Merricks asked C.B. what had occurred and who had harmed her, and C.B. told him that she was out with a male friend at a club the night before, and while at the club, she observed the defendant, her ex-boyfriend, was also at the club. When she noticed that the defendant appeared upset, she was afraid and asked her male friend to leave with her. The detective stated that C.B. told him that when she left the club with her male friend, she noticed that the defendant was following them in another vehicle, and she asked her friend to take her to the Third District police station so that she could have a police escort home.[3] After that, C.B. told the detective that she spent the night at her aunt’s house, waking up early the next morning to get ready for work. C.B. walked across the street to the apartment, locked the door behind her, and began preparing for work.
Detective Merricks testified that C.B. told him that as she was sitting on the toilet, she heard a noise, and the bathroom door was forced open by the defendant, who was “in a rage” and grabbed her by her hair and pulled her off the toilet. C.B. said that the defendant was screaming at her and that he penetrated her vaginally with his hand, advising her that she would never have sex with another man again. After C.B. managed to break away, the defendant again grabbed her by her hair and dragged her into the bedroom and penetrated C.B. vaginally and anally. C.B. told the detective that her neighbor heard her screaming and asked if she was okay, lc,and C.B. asked the neighbor to call the police. Magee fled the residence shortly thereafter.
Detective Merricks subsequently showed C.B. a single photo lineup on a separate occasion, after which time he secured a warrant for Magee’s arrest. When asked to describe C.B.’s demeanor at the time C.B. identified Magee in the photographic lineup, he testified that when he “informed her of what [his] investigation would lead to, she immediately, I guess you could say, shut down on me” and decided not to press charges. The detective stated that C.B. told him that she did not want the defendant arrested or to go to jail. C.B. ultimately signed the single photo photographic lineup identifying it as a photograph of Magee, “but identifying him as not the person who assaulted her.”
The detective testified that he took a written statement from C.B. after she signed the photograph which read:
I, [C.B.], do not want to press charges on [the defendant]. I just want [the defendant] to leave me alone. I did not call the police, and I don’t want the police involved.
He advised C.B. that she had already provided a corroborated statement to him and other police officers, and his department *952 had determined to proceed with the investigation.
Shamica Sullivan, a registered nurse and a sexual assault nurse examiner (“SANE”) at University Hospital, testified that she treated C.B. on 10 October 2010 and wrote a report in connection with her examination of C.B.; the report was admitted into evidence. After C.B. was examined by the physician, Ms. Sullivan obtained C.B.’s consent for the sexual assault examination and asked C.B. to [7provide a brief statement regarding what had occurred to cause her injuries. Reading from her report, Ms. Sullivan testified regarding C.B.’s account of the incident:
Okay. This is in [C.B.’s] own words. And she says that, “I was coming from sleeping by my auntie’s because I had to be to work for nine o’clock this morning. I went to the bathroom to run my water, then I had to have a bowel movement. When I was sitting on the toilet, I heard a noise. The next thing I know, [the defendant] was jumping on me, throwing me everywhere and putting his hands in my butt and my vagina trying to make sure I didn’t have sex with somebody. My neighbor must have heard the noise and called the police because I was hollering help, and she said, T hear you, [C.B.].’ ”
Continuing to read from her report, Ms. Sullivan testified as follows:
And I’ll say, she states, “I went out last night, and my boyfriend saw me talking with this guy at the club. When I left the club, I stayed by my auntie’s house, because I had to be to work for nine o’clock in the morning. I got up, went to my house, looked around to see if somebody was there. I didn’t see anybody, so I went to the bathroom to run my water, but I had to have a bowel movement. So I sat on the toilet, and then I heard a noise. And it was too late for me to run. He came in and started throwing me everywhere, kicked me, punched me, jumping on me. He put his fingers in my vagina and butt to see if I had had sex and called me stuff like ‘ho’ while he was doing it. I was hollering for help and my neighbor heard. She said, T hear you, [C.B.]. I’m calling the police.’ She also started yelling so my neighbors could hear. After that, he ran.” And I put, “Photos obtained.”
When questioned regarding C.B.’s injuries, Ms. Sullivan testified that C.B. had “numerous abrasions” around her neck, and bruising to her right upper forearm, to her left arm, and on her right upper thigh. C.B. also had a hematoma on the back of her neck, a bite mark on her left buttock, and her left foot toenail was missing. Ms. Sullivan stated that C.B. was covered in fecal matter and blood |8and that when she examined C.B.’s vagina, she observed vaginal tears caused from a person’s fingernails.[4] When asked whether C.B.’s account of the incident was consistent with the injuries on C.B.’s body, Ms. Sullivan answered in the affirmative. After the examination, C.B. requested to take a shower, which was permitted, as C.B. had been cleared to move around after having a CAT scan. C.B. was “visibly upset” and “crying a lot” while Ms. Sullivan was questioning her.
Andrew Nakamoto, M.D., who treated C.B. at University Hospital at approximately 9:50 a.m. on 10 October 2010 testified that C.B. was first treated by a triage nurse. The triage record indicated that *953 C.B. had no past medical history and noted “status post assault with fist on c-spine precautions,[5] plus abrasions to face. No loss of consciousness.”
Reading from the emergency department physician patient record, Dr. Naka-moto testified that the report read that C.B. was a twenty-nine year old, African-American female that had been sexually assaulted by her boyfriend at 8:45 a.m. that day.[6] Dr. Nakamoto also testified that C.B. “state[d] that the male | npenetrated her vagina with his fist” and choked her, but “denie[d] any penial [sic] penetration,” loss of consciousness, or head trauma. Also indicated in Dr. Nakamoto’s report was C.B.’s statement that “the male bit her on her right buttock” and that she complained of neck pain, pelvic pain, and some blood on her upper thigh.
Dr. Nakamoto further testified that he noted that C.B. had no past cervical history; C.B. was alert and oriented; her posterior cervical spine was tender to palpitation; and she had abrasions on both sides of her neck. He also noted in the report that her “belly [wa]s soft;” that she had a visible lesion to her right lateral buttock area; that she had visible blood on her medial thighs and vagina area; and that the toenail from her big left toe had been ripped off, causing a “good blood flow.” Because C.B. had so much visible trauma, before sending C.B. to the SANE nurse, Dr. Nakamoto ordered a urinalysis to test for pregnancy, a CAT scan of her cervical spine, and a “CTA” of C.B.’s neck, which “evaluates the arteries and veins in your neck to make sure that there’s no disruption of the artery or that you didn’t tear or transect any kind of vasculature in your neck.” He also prescribed “Delalutin”[7] for pain and Zoloft for nausea.
When asked to describe C.B.’s demean- or, Dr. Nakamoto testified that she was very upset, tearful, “in a lot of pain, a lot of distress” and was very upset about the incident. Next, Dr. Nakamoto was shown photographs of C.B. after the incident and described C.B.’s appearance. He testified that she had abrasions to her left cheek; ecchymosis, or bruising of the neck; and blood and feces on her upper thighs and vaginal area, consistent with being assault *954 ed anally and vaginally. _|j¡He noted that when he examined C.B., visible bite marks were present on her left buttock, but that the bite marks were not visible in the photograph. He testified that C.B. did not lose consciousness.
After the state rested its case-in-chief, a conference between counsel regarding C.B.’s testimony was held in chambers and outside of the presence of the jury. Thereafter, C.B. testified in the presence of the jury that she had a fight with the defendant on 10 October 2010. She testified that on that morning she slept at her best friend’s mother’s house because she was a “little tipsy” from the night before and could not locate her keys. That morning, she found her keys, walked home, and began preparing to go to work. As she was sitting on the toilet, she observed the defendant, who had apparently entered the house immediately after she did, and “charged at him,” and the two “started fist fighting” all over the house. C.B. further testified that she was throwing things at Magee, who “was trying to choke [her]” in an effort to defend himself from the objects which C.B. was throwing. When asked whether the defendant touched her vaginal area, C.B. testified that Magee accused her of having intercourse with another man, at which time she advised him to touch her to verify whether this was true; Magee complied.
On cross-examination, C.B. testified that she had known Magee for thirteen and a half years, and she admitted that she did not want to see him get into any trouble. When asked whether C.B. remembered speaking to a police officer after leaving a club at approximately 3:00 a.m. on 9 October 2010, she responded in the affirmative, testifying that “someone” was following her and her friend, so she asked her male friend to take her to the police station around the corner from her house. C.B. did not recall telling the officer that the person following her drove a |nsilver car, and she denied that the defendant drove a silver car, stating that he did not have a car. C.B. also denied telling the officer that she wanted to sleep at a neighbor’s home because she was afraid, insisting that she “was never afraid of [the defendant]” and that she advised detectives and doctors of same. C.B. further denied remembering speaking to a 911 operator after the incident,[8] but testified that she recognized her voice when the 911 tape was played. C.B. further testified that when the 911 operator asked where the defendant lived and she responded that he lived on the Westbank instead of on Encampment Street, she was “angry” and that the defendant actually lived with her at 4109 Encampment. When questioned regarding her statement to the 911 operator that Magee was driving around the corner in a car, C.B. again insisted that the defendant did not have a car.
C.B. denied that Magee forced his hands inside of her without her consent. When questioned whether she consented to the cut on her face, C.B. responded, “[w]e was fighting.” C.B. further testified that she consented to the bite mark on her buttocks and again stated that they were fighting. With regard to the injury to her toe, C.B. testified that she stubbed it. When presented with photographs of her injuries, C.B. similarly testified, “[y]es, I allowed *955 him to do that.” C.B. denied telling the SANE nurse that the defendant kicked in the door.[9]
When questioned regarding her statements to the responding officers who came to her home about how she thought the defendant followed her home the night before, dragged her across the house, and forced his hands inside of her, C.B. responded, “I was angry at the time” and that she allowed Magee to “check” her. [12C.B. testified that she told police that she was not raped and that she did not want to press charges.

ERRORS PATENT

A review of the record evidences an error patent as to the number of jurors and the correctness of the jury vote as to count one.
La.C.Cr.P. art. 782 states:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.
B. Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases. [Emphasis supplied.]
La. Const, art. I, § 17 provides in pertinent part:
(A) Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict....
(B) Joinder of Felonies; Mode of Trial. Notwithstanding any provision of law to the contrary, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at |,3hard labor; provided, however, that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; and provided further, that cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.
In count one, Magee was charged with the crime of home invasion. La. R.S. 14:62.8 governs the crime of home invasion and provides in pertinent part:
A. Home invasion is the unauthorized entering of any inhabited dwelling, or other structure belonging to another and used in whole or in part as a home or place of abode by a person, where a person is present, with the intent to use force or violence upon the person of another or to vandalize, deface, or damage the property of another.
B. (1) Except as provided in Paragraphs (2) and (3) of this Subsection, *956 whoever commits the crime of home invasion shall be fined not more than five thousand dollars and shall be imprisoned at hard labor for not more than twenty-five years. [Emphasis supplied.]
Accordingly, the jury in this case should have been composed of 12 jurors, ten of whom must have concurred to render a verdict, pursuant to La.C.Cr.P. art. 782.[10]
In State v. Brown, 11-1044 (La.3/13/12), 85 So.3d 52, the Supreme Court addressed the issue of whether a defendant who had been tried by a jury of twelve instead of six was entitled to a new trial. In Brown, the state charged the accused with one count of simple burglary of a religious building, a violation of La. R.S. 14:62.6, and one count of simple burglary, a violation of La. R.S. 14:62 (the second count was subsequently severed). A 12-person jury convicted the accused | Hof burglary of a religious building by a ten-to-two vote, and he was sentenced to 12 years at hard labor without benefit of probation, parole, or suspension of sentence. The court of appeal reversed the conviction and sentence upon discovering the jury composition error ex proprio motu as an error patent.
The Supreme Court reversed, finding that the accused actively participated and failed to object at any stage of the proceedings to the incorrect number of jurors.[11] The Court acknowledged that “longstanding jurisprudence of this Court had [previously] considered errors involving trials conducted in the wrong jury forum, whether the selected panel included a greater or lesser number of jurors than required by law, non-waivable jurisdictional defects which rendered any verdict returned absolutely null,” but noted that “under present law, trial of a six-person jury offense in a 12-person jury forum may take place if the offense is joined in a single proceeding with a 12-person jury offense, i.e., with an absolute felony necessarily punishable at hard labor.” Id. at p. 2, 85 So.3d at 53.
The Court determined that it did not need to reach the issue of whether the jury composition error prejudiced the defendant’s case because the defendant did not object to the incorrect jury composition and “actively participated in constituting the wrong jury forum.” Id. at p. 4, 85 So.3d at 54. Rather, “[i]n post-verdict motions for a new trial, arrest of judgment, and judgment of acquittal, [the defendant] attacked the sufficiency of the evidence supporting his conviction, but he did not raise the error with respect to jury composition, although La.C.Cr.P. art. 859(4) specifically provides, as one ground for arresting judgment, that ‘[t]he |,r,tribunal that tried the case did not conform with the requirements of Articles 779, 780 and 782 of this code.’ ” Id. Additionally, the defendant did not raise the error at the appellate level, although he “questioned the validity of a non-unanimous verdict on Sixth Amendment grounds.” Id.
The Court went on to distinguish its previous decision in State v. Jones, 05-0226 (La.2/22/06), 922 So.2d 508, which “held that the error in trying a six-person jury offense in a 12-person jury forum no longer constitutes a non-waivable structural defect in the proceedings but ‘falls with *957 in the vast category of trial errors which are subject to harmless error analysis and which warrant reversal only where the defendant is actually prejudiced.’ ” Brown, 11-1044, p. 3, 85 So.3d at 53. Notably, the Court also recognized “Jones specifically cautioned that: ‘Our holding here today does not guarantee the same result would be reached if a lesser number of jurors had been empaneled than required by law, or if there was not unanimity of verdict.’ ” Id. at p. 4, 85 So.3d at 54 [emphasis supplied].
The Court concluded:
However, because Jones made clear that the error of trying a six-person jury offense before a 12-person jury falls within the “vast numbers” of trial errors subject to harmless-error analysis, as opposed to errors interjecting a structural or jurisdictional defect in the proceedings, a necessary corollary of the decision is that the error also falls within the scope of Louisiana’s procedural default rules which generally require a defendant to timely preserve trial errors in the trial court for later appellate review. See, e.g., La.C.Cr.P. art. 841(A)(“An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”). Grounds for arresting judgment as a matter of La. C.Cr.P. art. 859, including jury composition errors under La.C.Cr.P. art. 782, may provide narrow exceptions to Louisiana’s general contemporaneous objection rule. See State v. Thomas, 427 So.2d 428, 433 (La.1982)(on reh’g)(although Louisiana does not have the equivalent of “plain error,” |1fi“[c]ertain rights are so basic that the Code of Criminal Procedure provides that they may be raised for the first time in arrest of judgment.”); State v. Gardner, 351 So.2d 105, 107 (La.1977) (“Defendant properly raised this error [in jury composition] in his motion in arrest of judgment ... no objection was necessary at the time of the jury selection, nor was a showing of prejudice required.”). However, in the present case, respondent neither objected at the time of jury selection, nor moved in the trial court in arrest of judgment, on grounds that the composition of his jury violated the terms of La. C.CrJP. art. 782. In the latter case, and even assuming that a defendant may participate actively in constituting the wrong jury forum and then complain after verdict about the error in the district court, a motion in arrest of judgment on those grounds “must be filed and disposed of before sentence.” La.C.Cr.P. art. 861.
Under these circumstances, Jones has modified our former rule that “an error in the size of the jury is discoverable on the face of the record and therefore we may note it ex proprio motu without formal objection or an assignment of error” as a basis for reversing a defendant’s conviction and sentence. State v. Smith, 367 So.2d 857, 858 (La.1979). That rule was based on the now discarded supposition that errors in jury composition are invariably jurisdictional or structural in nature. In the present case, to the extent that [the defendant ] failed altogether to employ the procedural vehicles provided by law for preserving the error for review, he waived any entitlement to reversal on appeal on grounds that he was tried by a jury panel which did not conform to the requirements of La. Const. art. I, § 17 and La.C.Cr.P. art. 782 because it included a greater number of jurors than required by law, although the error is patent on the face of the record. See Jones, 05-0226 at 5, 922 So.2d at 516 (Weimer, J., concurring).
*958 Brown, 11-1044, pp. 4-6, 85 So.3d at 54-55 [emphasis supplied].
The facts in the case at bar are not analogous to Brown, because Magee had fewer jurors than required, whereas in Brown, the defendant had more jurors than required. We find that Brown is not applicable to this case and that the principle of law in Jones is still applicable; Ma-gee did not waive his entitlement to reversal 117based upon a jury panel that did not conform to the requirements of La. Const, art. I, § 17 and La.C.Cr.P. art. 782.
We do not find that a harmless error analysis is applicable to this case. The Louisiana Supreme Court noted in State v. Haddad, 99-1272 (La.2/29/00), 767 So.2d 682, 689:
Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational factfinder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant’s jury. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In that case, the United States Supreme Court stated:
The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.
Id. at 2081.
As previously noted herein, pursuant to La.C.Cr.P. art. 782 and La. Const, art. I, § 17, Magee’s jury panel should have been comprised of 12 jurors, ten of whom must have concurred to render- a verdict on count one, the alleged violation of La. R.S. 14:62.8. The six-person jury acquitted Magee on that felony charge. His acquittal on the La. R.S. 14:62.8 charge stands and is valid.
Magee was convicted by a panel comprised of six jurors on count two, the alleged violation of La. R.S. 14:43.2. A correct number of jurors decided his guilt on that charge. Therefore, as to count two, no error patent exists.

ASSIGNMENT OF ERROR NUMBER 1

hsMagee first argues that the evidence presented at trial, viewed in the light most favorable to the prosecution, was not sufficient for any rational trier of fact to have found him guilty of second degree sexual battery (count two).
In State v. Ferdinand, 12-0283, pp. 6-7 (La.App. 4 Cir. 1/30/13), 107 So.3d 1266, 1270-71, this court again acknowledged the well-settled standard for reviewing a sufficiency claim:
When reviewing the sufficiency of the evidence to support a conviction, this Court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction “the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed *959 by a reviewing court. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
When there is conflicting testimony about factual matters, the resolution of which depends upon a determination of credibility of the witness, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 94-1895 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078. The trier of fact determines the weight to be given the evidence presented. It is not the function of an appellate court to assess credibility or reweigh the evidence. State v. Helou, 2002-2302, p. 5 (La.10/23/03), 857 So.2d 1024, 1027.
A fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Jackson v. Virginia, supra, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573-74. Where rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view | i9of all evidence most favorable to the prosecution must be adopted on review. Only irrational decisions to convict by the trier of fact will be overturned. See State v. Mussall, 523 So.2d 1305, 1310 (La.1988). [Emphasis supplied.]
La. R.S. 14:43.2 pertains to the crime of second degree sexual battery and provides, in pertinent part:
A.Second degree sexual battery is the intentional engaging in any of the following acts with another person when the offender intentionally inflicts serious bodily injury on the victim:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.
B.For the purposes of this Section, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. [Emphasis supplied].
Magee argues that although the state may have presented sufficient evidence to prove each element of the crime charged, the evidence was circumstantial because C.B. testified that she consented to the defendant’s acts. Therefore, Magee argues that the state failed to disprove his reasonable hypothesis of innocence, as C.B. testified that she initiated the fight with him that resulted in abrasions to her neck and head area while defending herself, and that she consented to him digitally penetrating her vagina. Magee further argues that C.B. never advised anyone that the defendant’s actions were without her consent, and therefore, an essential element of the offense of second degree sexual battery was not established.
| ^Contrariwise, the state argues that C.B.’s testimony contradicts five other witnesses, all of whom testified that C.B. indicated that she did not consent to the defendant penetrating her vagina, and that the competing testimony regarding whether C.B. gave her consent does not establish reasonable doubt. Additionally, the state submits that the jury found the state’s witnesses to be credible and apparently disbelieved C.B.’s testimony.
As previously noted herein, this court has recognized the well-settled principle that conflicting testimony regarding factual matters goes to weight of the evidence:
*960 [Conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244, 1249 (La.App. 4 Cir.1989). Like all factual matters, credibility determinations are entitled to great weight and will not be disturbed unless contrary to the evidence. Id., citing State v. Vessell, 450 So.2d 938 (La.1984).
State v. Fortenberry, 11-0022, p. 7 (La.App. 4 Cir. 7/27/11), 73 So.3d 391, 396.
In this case, the jury’s determination that Magee was guilty of second degree sexual battery was not contrary to the great weight of the evidence. Although C.B. may have recanted the version of events that she relayed to the responding officer, Detective Deirish, the SANE nurse, Dr. Nakamoto, and Detective Mer-ricks, the state presented sufficient evidence to establish that the defendant intentionally inflicted serious bodily injury and caused extreme physical pain to C.B. Detective Merricks testified regarding his interview with C.B. in the hospital after the incident, at which time C.B. told him that the defendant grabbed her by her hair and penetrated her anally and vaginally. Similarly, Shamica Sullivan, the SANE nurse, testified regarding her report of C.B.’s account of the incident, wherein C.B. | g1told her that Magee jumped on her, threw her, kicked her, punched her, and put his hands in her vagina and her anus. Likewise, Dr. Na-kamoto testified that according to his emergency department physician patient record, C.B. told him that her assailant penetrated her vagina with his fist, choked her, and bit her right buttock, and that C.B.’s injuries were consistent with being assaulted anally and vaginally.
With regard to whether the defendant caused C.B. serious bodily injury, the state established that Magee intentionally caused “serious bodily injury” to C.B. which caused “extreme physical pain,” thereby meeting the requirements of proving a second degree sexual battery pursuant to La. R.S. 14:43.2. In addition to the testimony above, Ms. Sullivan testified that C.B. had vaginal tears caused by the defendant’s fingernails, numerous bruises and abrasions, a missing toenail, and a bite mark on her right buttock. When asked whether C.B.’s injuries were consistent with C.B.’s account of the incident, Ms. Sullivan testified in the affirmative. Dr. Nakamoto similarly testified that C.B. told him that she had neck and pelvic pain, and he also observed the missing toenail and resulting blood.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 2

In the second and final assignment of error, Magee argues that the state knowingly violated his Sixth Amendment right to confront his accusers when the prosecutors introduced C.B.’s out-of-court statement, knowing with absolute certainty that the state never intended to present C.B. as a witness to be subjected to cross-examination.[12]
*961 | gsMagee relies upon Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), citing the following passage:
The Confrontation Clause of the Sixth Amendment provides: “In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” In Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for *962 cross-examination.” A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase “testimonial statements.” Only statements of this sort cause the declarant to be a “witness” within the meaning of the Confrontation Clause. See id., at 51, 124 S.Ct. 1354. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.
Magee further argues that the state cannot shift the burden of production to a defendant, relying upon Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).
|24In State v. Grimes, 2011-0984, pp. 21-22 (La.App. 4 Cir. 2/20/13), 109 So.3d 1007, 1018-1019, we summarized Melendez-Diaz v. Massachusetts as follows:
In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), a plurality decision with one justice concurring and four justices dissenting, three “certificates of analysis” certifying that substances seized by police from the defendant contained cocaine were introduced at trial pursuant to Massachusetts law as “pri-ma facie evidence of the composition, quality, and the net weight of the narcotic ... analyzed.” Melendez-Diaz, 557 U.S. at 309, 129 S.Ct. at 2531, quoting Mass. Gen. Laws, ch. Ill, § 13. The certificates were sworn before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under the same Massachusetts statute. The defendant appealed his conviction, arguing, inter alia, that admission of the certificates violated his Sixth Amendment right to be confronted with the witnesses against him. The Appeals Court of Massachusetts rejected the claim, citing precedent that the authors of certificates of forensic analysis were not subject to confrontation under the Sixth Amendment. The Supreme Judicial Court of Massachusetts denied review.
The U.S. Supreme Court characterized the certificates of analysis as affidavits, “functionally identical to live, in-court testimony doing ‘precisely what a witness does on direct examination.’ ” Melendez-Diaz, 557 U.S. at 310-311, 129 S.Ct. at 2532 (emphasis in original), quoting Davis v. Washington, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court held that under its decision in Crawford [v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ], the analysts’ affidavits were testimonial statements, and the analysts were witnesses for purposes of the Sixth Amendment. Citing Crawford, the Court held that absent a showing that the analysts were unavailable to testify at trial and that the defendant had a prior opportunity to cross examine them, he was entitled to be confronted with the analysts at trial.
In State v. Simmons, 11-1280, p. 4 (La.1/20/12), 78 So.3d 743, 745, the Louisiana Supreme Court summarized the holding of Melendez-Diaz as follows:
lafiln what the majority termed a “rather straightforward application” of the Court’s prior decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), Melendez-Diaz held that a state may not, over a defendant’s objections under the Confrontation Clause of the Sixth Amendment, introduce as substantive evidence a criminalist’s certificate attesting to the fact the substances tested in the laboratory revealed the presence of contraband drugs (e.g., *963 cocaine), unless the criminalist is unavailable to testify and the defendant had a prior opportunity to cross-examine him. Melendez-Diaz, 557 U.S. at [310-312], 129 S.Ct. at 2532. Melendez-Diaz announced the holding in the context of a Massachusetts statute which permitted introduction of the crime lab certificates as “‘prima facie evidence of the composition, quality, and the net weight of the narcotic analyzed,’ ” id., 557 U.S. at [309], 129 S.Ct. at 2531 (quoting Mass. Gen. Laws, ch. 111, § 13), and the majority flatly rejected the state’s suggestion that because the defendant had remained free to subpoena the criminalist of his own accord but chose not to do so, no Confrontation Clause violation occurred:
Respondent asserts that we should find no Confrontation Clause violation in this case because petitioner had the ability to subpoena the analysts. But that power — whether pursuant to state law or the Compulsory Process Clause — is no substitute for the right of confrontation. Unlike the Confrontation Clause, those provisions are of no use to the defendant when the witness is unavailable or simply refuses to appear. Converting the prosecution’s duty under the Confrontation Clause into the defendant’s privilege under state law or the Compulsory Process Clause shifts the consequences of adverse-witness no-shows from the State to the accused. More fundamentally, the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court. Its value to the defendant is not replaced by a system in which the prosecution presents its evidence via ex parte affidavits and waits for the defendant to subpoena the affiants if he chooses. 12c Melendez-Diaz, 557 U.S. at [324-325], 129 S.Ct. at 2540 (citation omitted). [Emphasis supplied.]
The Court further noted:
In the present case, respondent waived his Sixth Amendment right of confrontation by failing to timely request a subpoena for the analyst who performed the test on the rocks of cocaine. As Melendez-Diaz observed, states remain free to impose reasonable restrictions on a defendant’s assertion of his confrontation rights and the trial court therefore did not abuse its discretion in failing to issue an instanter subpoena for the out-of-parish criminalist at the risk of delaying a one-day trial after respondent failed to timely request that a subpoena issue for the witness. Given the circumstances, the trial court properly admitted the analyst’s certificate in lieu of the analyst’s live testimony.
Simmons, 11-1280, p. 7, 78 So.3d 743, 747.
The state argues that Magee’s assignment of error has been waived pursuant to La.C.Cr.P. art. 841 because he failed to contemporaneously object with regard to his right to confront his accusers. The state further argues that Melendez-Diaz v. Massachusetts is distinguishable because in that case, the analysts did not testify that the seized evidence was cocaine, and only certificates indicating that the material tested positive for cocaine were admitted, which precluded the defendant therein from cross-examining the analysts. In this case, the state submits that C.B. actually testified at trial, and Magee had ample opportunity to confront his accusers in conformity with the Confrontation Clause.
This case is factually distinguishable from Melendez-Diaz because each witness who took a statement from C.B. that was used at trial also testified at trial. Fur *964 ther, C.B. testified at trial, and the defendant was thereby afforded the opportunity to confront his accusers at trial.
This assignment of error, even if properly preserved for review, lacks merit.
Jgj CONCLUSION
For the foregoing reasons, we affirm Magee’s conviction and sentence.
AFFIRMED.
LOVE, J., concurs.

. The minutes reflect that the trial court issued an alias capias for the defendant because he left the courtroom after the guilty verdict was read. Additionally, C.B., the victim, was held in contempt of court for an "outburst” and possibly assisting the defendant in his attempt to escape after the guilty verdict. On 2 February 2012, C.B.’s contempt hearing was held; the trial court referred C.B. to a domestic violence service program and issued a stay-away order.

. We refer to the victim in this case by her initials only to protect her identity.

. Officer Jermaine Faulkner of the NOPD testified that on 9 October 2010, C.B. approached him while he was in a parking lot at the intersection of Mirabeau and Paris Avenues in New Orleans. C.B. appeared frightened and indicated that someone was following her. Officer Faulkner took C.B. back to her residence on Encampment Street and asked who was following her.

. Ms. Sullivan also testified that she observed a "peanut-shaped mass” on C.B.'s anus that did not appear to have been caused by the trauma, but was covered in blood and fecal matter.

. Dr. Nakamoto explained that patients who have any kind of visible trauma to the EMS personnel will have a C-collar and a spine board used.

. Christopher Canning, a paramedic with the EMS responding to the Encampment Street call on 10 October 2010, testified at trial. He and another paramedic, Kenny Hender, assisted C.B., who advised them that she had been assaulted, kicked, punched, and raped. Mr. Canning recalled that C.B. had “minor abrasions throughout” as well as vaginal bleeding and trauma to her face. He testified that C.B. told him that her vaginal bleeding was caused by the attacker forcing his hand into her vagina.
Mr. Canning also made a Patient Care Report of the incident that was introduced into evidence. When asked to clarify certain abbreviations on the report, he testified "the person knows who she is, where she is, what time it is, and she remembers clearly what happened.” He further stated that the report indicated that ”[h]er airway, breathing and circulation were intact" in both lungs, and abrasions and scrapes on the side of C.B.’s head present, but no deformity on her face. Additionally, the report indicated that C.B. could move all of her extremities, "and her pulse, motor, and sensory functions were all intact in both her arms and her legs.” C.B. was moved onto a "long spine board,” a plastic board to immobilize her in case of a neck or back injuiy, and a plastic collar was placed around her neck. Mr. Canning explained that the spine board was used because the abrasions and trauma to C.B.’s head could have resulted in forces upon her neck. When asked whether C.B. complained that she was unable to walk, Mr. Canning responded negatively.

.The word was transcribed “Delalutin” but appears to have been "Dilaudid.”

. Yolanda Haynes, a 911 operator as well as a custodian of records, testified at trial. Ms. Haynes testified that when a 911 call is received, the location address is noted and an item number is assigned to the call. She reviewed the incident recall sheet regarding the 911 call made in this case, which is a printed sheet of what was recorded on the 911 tape and also listened to the 911 tape. Both the tape and incident recall sheet were introduced into evidence.

. C.B. testified that Magee had a key to her house.

. The crime of second degree sexual battery is punishable with or without hard labor. La. R.S. 14:43.2 states: "Whoever commits the crime of second degree sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than fifteen years.”

. The Court acknowledged that the trial was conducted with the incorrect number of jurors. Brown, 11-1044, p. 2, 85 So.3d at 53.

. At trial, when the defense announced that its next witness was C.B., a conference was held in chambers wherein the following colloquy occurred:
BY THE COURT:
Outside the presence of the jury, we’re in the back. The State has rested its case-in-chief. Defense is now presenting its case. Who is your first witness, [defense counsel]?
[COUNSEL FOR DEFENDANT]:
[C.B.], Your Honor.
BY THE COURT:
That’s the victim?
[COUNSEL FOR DEFENDANT]
The alleged victim, Your Honor.
BY THE COURT:
So now she’s a defense witness?
[COUNSEL FOR DEFENDANT]:
She's always been a defense witness.
*961 BYTHE COURT:
State, you all knew about this? See, this is the part that [is] truly frustrating to this Court, and I want the Record to bear that out. If you all are part of these shenanigans that are going on, then I have a serious problem in terms of how you all can ethically proceed with matters, not only in this section, but in this building.
[COUNSEL FOR THE STATE]:
The defense has been hiding the victim from—
BY THE COURT:
[Counsel for the State], I understand what your frustration might be on this as the supervisor, but with all due respect to you, ma’am, she is a victim who the State of Louisiana is supposed to be in touch with, okay?
[COUNSEL FOR THE STATE]:
And we can put on the Record all of the efforts our office has been making to try to contact the victim, phone calls, numerous addresses, trying to serve the victim through the mail, having investigators trying to serve the victim, who've made extraordinary efforts over the last couple of months to reach the victim in this case.
[COUNSEL FOR THE STATE]:
And, Judge, we've even reached out to her family members, her place of work. We’ve done everything in our power to serve her.
BY THE COURT:
So you all knew you weren’t going to have her, unlike what I thought in the beginning when I started this trial? You all knew you weren’t going to have her is what you're saying?
[COUNSEL FOR THE STATE]:
Today, yes, that’s correct. We knew.
BY THE COURT:
So you all knew you weren't going to have her?
[COUNSEL FOR THE STATE]:
Absolutely.
BY THE COURT:
Okay. Again, that brings my level of frustration even higher. But, okay. Let’s proceed.
[COUNSEL FOR DEFENDANT]:
May I also say, Your Honor, State’s say[ing] they knew they weren’t going to have her, but they listed her as a witness when they addressed the jury and told them about the possible witnesses that they were—
[COUNSEL FOR THE STATE]:
Keyword is "possible.”
[COUNSEL FOR DEFENDANT]:
No. You said witness and then listed her name.
BY THE COURT:
She did say potential witness.
[COUNSEL FOR THE STATE]:
And Your Honor, again, I noted there’s other defense counsel in the courtroom, but if at anytime the State becomes aware that the victim may be perjuring herself, we’d ask for a sidebar so that she may be properly advised by independent counsel.
[COUNSEL FOR DEFENDANT]:
And, Your Honor, she has not been charged with a crime. I believe that the State would intend to, basically, to intimidate [C.B.] as they have, in fact, in the past. I know of no reason why she cannot tell the truth. If the State is not happy with what she, in fact, has to say, they have their own — and they can do what they will. But why she would, in fact, be told by a lawyer that she does not have to testify when she does have to testify—
[COUNSEL FOR THE STATE]:
And people are charged with perjury in this building all the time. And we have a duty, if we see a crime occurring in front of us, that that person be advised when she’s voluntarily making a statement about the defendant. Also, she testified at the previous motion hearing. And we’re not sure what kind of advice she’s getting because we’ve been trying to talk to her.